IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| C. M. COLLINS, N. J. LUNDY, and R. C. L. MAYS, *individually, and on behalf of all others similarly situated,* | § § § § | |
| **Plaintiffs,** | § § | NO. 4:22-CV-1073-SDJ |
| v. | § § | **PLAINTIFFS' MOTION FOR NOTICE** |
| **CATASTROPHE RESPONSE UNIT, INC. and CATASTROPHE RESPONSE UNIT USA, INC.,** | § § § § | **ORAL ARGUMENT REQUESTED** |
| **Defendants.** | § § § | |

## I.   INTRODUCTION

Plaintiffs C.M. Collins, N.J. Lundy, and R.C.L. Mays, individually, and on behalf of all others similarly situated, allege that Defendants Catastrophe Response Unit, Inc. and Catastrophe Response Unit USA, Inc. (collectively, "Defendants" or "CRU") violated the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*, as amended ("FLSA"), by failing to pay Plaintiffs[1] and other similarly situated workers ("potential plaintiffs") overtime wages as required by the FLSA for any hours worked in excess of forty (40) hours in a single workweek. *See* 29 U.S.C. § 207(a). Plaintiffs and potential plaintiffs are current and former insurance desk adjusters who worked from home for CRU, were paid on a daily rate,[2] were misclassified as independent contractors,[3] and routinely worked over 40 hours in a workweek without being paid an overtime premium for hours over 40.[4]

CRU is engaged in the business of providing "daily claims, catastrophe response, and loss control services"[5] to their clients—major insurance carrier clients in the United States and

---

[1] In addition to the three original Named Plaintiffs, there are currently an additional 13 Opt-in Plaintiffs who have joined the lawsuit.
[2] Defs' Original Answer, ECF 13 at ¶ 18.
[3] *Id.* ¶ 16.
[4] *Id.* ¶ 15.
[5] *See* "About Us", CRU GROUP, https://cruadjusters.com/about-us/, (last visited Nov. 21, 2023).

Canada.[6] To provide these services, CRU relies on the work of desk adjusters—"critical workers"[7] who are "essential" to CRU's value proposition. *See* Ex. G, Repinski Dep. 47:18–21. CRU uniformly classified all desk adjusters, including Plaintiffs and potential plaintiffs, as independent contractors.[8] CRU paid each desk adjuster on a day rate basis, meaning the desk adjuster was paid the same amount for each day worked, without regard to the number of hours worked. Plaintiffs seek to send court-authorized notice to similarly situated workers ("potential plaintiffs") defined as:

> **All individuals who worked for CRU as Desk Adjusters in the United States, were classified as independent contractors, and were compensated on a day rate basis within the three-year period preceding the filing of this lawsuit.**

As set forth below, the facts alleged in Plaintiffs' pleadings, along with written discovery responses and sworn deposition testimony submitted as evidence, show "sufficient similarity between the plaintiffs' employment situations" and the employment situations of this group of workers. *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 441 (5th Cir. 2021). Therefore, Plaintiffs request the Court order Defendants to promptly disclose contact information for the potential plaintiffs and authorize notice to the potential plaintiffs of their right to opt-in to this lawsuit.

## II.  LEGAL STANDARD

On January 12, 2021, the Fifth Circuit established the standard for determining an FLSA collective action in the Fifth Circuit. *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430 (5th Cir. 2021). Prior to *Swales*, many courts in the Fifth Circuit followed the now defunct *Lusardi* approach, which laid out a two-step process to determine whether prospective plaintiffs in a proposed collective are "similarly situated" enough to satisfy the FLSA. *See Lusardi v. Xerox*

---

[6] Defs' Original Answer, ECF 13 at 4.
[7] *See* "CRU GROUP Announces Partnership with WingSpan," CRU GROUP, https://cruadjusters.com/cru-group-announces-partnership-with-wingspan, (last visited Nov. 21, 2023).
[8] Beginning around July 2023, CRU began classifying its U.S.-based adjusters on one of its main contracts as W-2 employees, eligible for overtime pay by law, in response to this lawsuit. Ex. H, Dickens Dep. 73:3–75:8; 105:16–20.

*Corp.*, 118 F.R.D. 351, 361 (D.N.J. 1987). Step one, known as "conditional certification," determined whether proposed members were similar enough to receive initial notice of the pending lawsuit. *Id.* Step two, known as the decertification stage, occurred after full discovery allowing the court to make a final determination as to whether the named plaintiffs and opt-ins were "similarly situated" so they may proceed to trial as a collective. *Id.* The court considered three factors at step two: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* If the court found that the opt-ins were not sufficiently similar to the named plaintiffs, it would then dismiss the opt-ins, leaving only the named plaintiff's original claims. *Id.*; *see also Swales*, 985 F.3d at 436–37.

The *Swales* standard eliminates conditional certification (or any "certification" for that matter) and instead, considers whether, after preliminary discovery, opt-in notice should be distributed to potential plaintiffs who are "similarly situated" as stated in the FLSA. *Roberts v. Baptist Healthcare Sys., LLC*, No. 1:20-CV-00092-MAC, 2022 U.S. Dist. LEXIS 160236, at *7–8 (E.D. Tex. Aug. 9, 2022) (quoting *Swales*, 985 F.3d at 436-437 ("The bottom line is that the district court has broad litigation-management discretion . . . cabined by the FLSA's 'similarly situated' requirement and the Supreme Court's decision in *Hoffman La-Roche*. But it is not captive to *Lusardi* or any 'certification' test."))[9] *Swales* states that a:

> district court should identify, at the outset of the case, what facts and legal considerations will be material to determining whether a group of "employees" is "similarly situated." And, then it should authorize preliminary discovery accordingly. The amount of discovery necessary to make that determination will vary case by case, but the initial determination must be made, and as early as possible.

---

[9] *See also In re A&D Interests, Inc.*, No. 22-40039, 2022 WL 1315465, at *1 (5th Cir. May 3, 2022) (finding *Swales* "did away with conditional certification in FLSA cases."); *Avila v. SLSCO, Ltd.*, No. 3:18-CV-00426, 2022 U.S. Dist. LEXIS 45423, 2022 WL 784062, at *4 (S.D. Tex. Mar. 15, 2022), *R. & R. adopted*, No. 3:18-CV-00426, 2022 U.S. Dist. LEXIS 59589, (S.D. Tex. Mar. 31, 2022) ("In January 2021, the Fifth Circuit did away with conditional certification altogether."); *Young v. Energy Drilling Co.*, No. 4:20-cv-1716, 2021 WL 1550343 *1 (S.D. Tex. April 20, 2021) (construing motion for conditional certification as a motion for Section 216(b) notice with no "certification").

*Swales*, 985 F.3d at 441. The *Swales* standard still takes into consideration the three factors used at step two of the Lusardi approach. *Id.*

In this case, the Court previously authorized preliminary discovery "limited to issues directly relevant to the Section 216(b) motion."[10] Preliminary discovery is complete and demonstrates that putative members of the FLSA collective are similarly situated to Plaintiffs. Therefore, the Court should order notice of this action be sent to such persons.

### III.    ARGUMENTS AND AUTHORITIES

It is the plaintiff's burden to show the potential plaintiffs are similarly situated. *Swales*, 985 F.3d at 443 n.65. Courts consider three factors to determine whether potential plaintiffs are similarly situated: "(1) the disparate factual and employment settings of the proposed plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each proposed plaintiff; and (3) fairness and procedural considerations." *Roberts v. Baptist Healthcare Sys., LLC*, No. 1:20-CV-00092-MAC, 2022 U.S. Dist. LEXIS 160236, at *8-9 (E.D. Tex. Aug. 9, 2022). The term "similarly situated" does not mean that the proposed members are "identically situated." *Torres v. Chambers Protective Servs.*, No. 5:20-CV-212-H, 2021 U.S. Dist. LEXIS 146586, at *10 (N.D. Tex. Aug. 5, 2021). The court must instead ask whether the plaintiff has "demonstrated similarity among the individual situations." *Segovia v. Fuelco Energy LLC*, No. SA-17-CV-1246-JKP, 2021 WL 2187956, at *8 (W.D. Tex. May 28, 2021). This can be done by showing a factual nexus that binds the plaintiffs and the potential plaintiffs as alleged victims of a particular policy or practice. *Id.* Having some differences between the plaintiffs and the potential plaintiffs "will not preclude a collective action unless they are material to ultimate issues before the trial court." *Id.* Plaintiffs discuss these three factors below.

### A.    Similar Factual and Employment Settings

"Evidence of a similar job description coupled with allegations revolving around the same aspect of the job is sufficient to find putative class members similarly situated." *Garcia-Alvarez v.*

---

[10] *See* ECF 2.

*Fogo De Chao Churrascaria (Pittsburgh) Ltd. Liab. Co.*, Civil Action No. 4:21-CV-00124, 2022 U.S. Dist. LEXIS 105113, at *10 (E.D. Tex. June 13, 2022) (Mazzant, J.) (citing *Lopez-Gonzales v. Ramos*, No. 2:20-CV-061-Z, 2021 U.S. Dist. LEXIS 140943, at *11 (N.D. Tex. July 28, 2021) ("[C]ourts have required plaintiffs to provide evidence that potential opt-in plaintiffs had (1) similar job requirements and (2) similar pay provisions to support the allegation that potential opt-in plaintiffs are similarly situated.")).

Written discovery and sworn deposition testimony taken during preliminary discovery show that Plaintiffs and the potential plaintiffs are similarly situated, and notice to potential plaintiffs is appropriate under *Swales*.

### Deposition testimony of Defendants' Corporate Representative, David Repinski, CEO of CRU Group

On August 28, 2023, Plaintiffs deposed David Repinski, CEO of CRU Group,[11] as Defendants' corporate representative.[12] On behalf of Defendants, Mr. Repinski testified that CRU is a loss adjusting firm, Ex. G, Repinski Dep. 47:18-21, and that the vast majority of their clients are insurance companies. *Id.* at 28:15–16. CRU provides "people to facilitate the claims adjusting process," *id.* at 28:15–16, including desk adjusters, using what CRU calls a "contractor model." *Id.* at 28:25–29:1. CRU has a contractor roster with 12,000 individuals on it residing in all 50 states. *Id.* at 19:16–17; 33:14. Since COVID, CRU has allowed these contractors, including desk adjusters, to work from home. *Id.* at 34:1–3; 38:20–23. During the relevant time period for this case,[13] CRU classified these desk adjusters as independent contractors and paid them on a day rate

---

[11] Repinski testified that Catastrophe Response Unit, Inc., a Canadian business, and Catastrophe Response Unit USA, a U.S. business, are "two legal entities," Ex. G, Repinski Dep. 44:10–13 but that the two "trade as CRU Group" *Id.* at 44:9.

[12] By agreement of counsel, Repinski gave one deposition as corporate representative of both Defendants.

[13] The relevant time period is three years prior to the filing of the complaint (December 27, 2019) to the present. *See* 29 U.S.C. § 255.

basis without overtime compensation. *Id.* at 31:13–23.[14] If a desk adjuster did not work a full day, CRU was not able to bill the client for a full day and thus, the desk adjuster would only get paid for a half-day or partial day. *Id.* at 102:12–25; *see also* Ex. S at 19. CRU USA.

Desk adjusters are essential to the services that CRU provides its clients. Ex. G, Repinski Dep. 47:18–21. To recruit desk adjusters, CRU attends various conferences frequented by adjusters, advertises on social media such as LinkedIn and Facebook, posts in various Facebook groups, sends out notices when needing adjusters for a certain event in a certain area, and relies on word of mouth. *Id.* at 56:16–21; 57:11–14. CRU requires all desk adjusters to sign independent contractor agreements for each deployment. *Id.* at 65:25–66:6. As of June 2020, CRU implemented one standard contract for American workers, regardless of whether they are working in the U.S. or Canada, and regardless of whether that contractor is a field adjuster or a desk adjuster.[15] *Id.* at 78:8–9; 108:20. Also as of June 2020, all American contractors are paid through CRU's U.S. entity, which is Defendant Catastrophe Response Unit USA, Inc. *Id.* at 77:25.

After signing the independent contractor agreement, CRU sends the desk adjuster a welcome or informational packet containing corporate policies. *Id.* at 68:8–11.[16] The desk adjuster may also receive IT equipment. *Id.* at 66:21–67:3. If specified by the client, CRU may require the desk adjuster to complete online training modules and view videos covering such topics as the

---

[14] Repinski testified that in July 2023, CRU negotiated a new contract with TD Insurance in which its desk adjusters are now classified as hourly-paid, overtime eligible employees for whom CRU withholds payroll taxes and will issue an IRS Form W-2. Ex. G, Repinski Dep. 82:25–84:6. This change was made to protect CRU from future liability "based on this lawsuit" and the "changing landscape . . . with respect to . . . FLSA matters." *Id.* at 82:9–11; 84:7–13. In their interrogatory responses, CRU offered a different explanation for the change. *See* Ex. S at 8 ("In July 2023, CRU USA made the decision to switch paying independent adjusters deployed to work with TD, from a day rate to hourly, because CRU USA believed that CRU USA adjusters working with TD would prefer to be paid by the hour, with the benefit of earning overtime, for any limited instance when you would qualify for overtime.") CRU also classified its desk adjusters as employees when the contract with its client, Seibels, required CRU to only provide employees. Ex. G, Repinski Dep. At 85:11–14) ("They would not accept contractors."). Nevertheless, Repinski stated CRU continues to have desk adjusters working for other clients who are still classified as independent contractors and paid a day rate. *Id.* at 80:13–15.

[15] *See*, *e.g.*, Ex. T, Independent Contractor Agreement.

[16] *See, e.g.*, Ex. U, Independent Contractor Onboarding Packet.

claims software used, client expectations of policyholder outcomes, cultural training, etc. *Id.* at 68:21–69:6.

Repinski described the job duties of a desk adjuster as "investigating loss details, completing coverage analysis, settling or paying claims (i.e., reimbursement, case payout, etc.), and compiling subrogation packages, if necessary." *Id.* at 45:5–11. A typical day for a desk adjuster includes "telephone outreach with claimants and/or insureds, updating the file notes and claims management system for the client or clients that they're serving, receiving direction and redirections around policy wordings, endorsements, productivity from above," *id.* at 48:6–10 i.e., "that may start with CRU management, [but] most often comes from [CRU's] client." *Id.* at 48:12–15. CRU requires desk adjusters to check in at the beginning of their day in Microsoft Teams by typing "good morning" into the team chat to let their team lead know they are beginning their work. *Id.* at 51:1–21. Throughout the day, team leads and/or managers communicate with desk adjusters regularly and through a variety of means, including Microsoft Teams chat, phone, email, and text. *Id.* at 56:5–8; 103:8.

To ensure CRU meets the demands of its clients, CRU management and team leads manage desk adjusters and control their schedules. *Id.* at 112:17–18. This level of supervision is necessary, according to Repinski, because CRU has numerous expectations placed on it by its clients. *Id.* at 53:25–54:2. CRU, therefore, must ensure desk adjusters are scheduled to be working and available per client needs. *Id.* at 54:4–7.

CRU is also subject to what Repinski described as "extreme" time-based contractual requirements in its contracts with clients that detail expectations for claim closure rates. *Id.* at 52:16–18. If CRU does not meet these requirements, the company is subject to fines and penalties. *Id.* at 53:2–5. For example, CRU's master services agreement and statement of work with client TD Insurance—which Repinski estimated accounts for 50 percent of CRU's business during the period covered by this lawsuit, *id.* at 118:18–119:12—outlines the financial terms between the two companies and includes the potential for high level penalties against CRU for failing to meet certain outcomes, which are usually time-based, such as closing a certain percentage of claims

within an allotted time. *Id.* at 86:14–20. TD Insurance communicates regularly and even daily with CRU management to show how CRU desk adjusters are trending on claims statistics. *Id.* at 87:14–19; 87:25. If CRU desk adjusters fail to meet the metrics set in CRU's contract, CRU would be responsible for cutting a check back to TD Insurance. *Id.* at 88:12–13.

To avoid this and ensure CRU does not lose revenue from clients, CRU monitors the work of desk adjusters closely. CRU monitors desk adjusters' individual productivity, productivity relative to one another, escalated phone calls or complaints, number of reopened claims, time elapsed related to certain activity on files (e.g., contacting the policyholder, setting an inspection, adjudicating a claim), and incorrect coverage determinations. *Id.* at 89:23–90:2; 91:14–23. CRU requires desk adjusters to document claims activity in a claims management system ("CMS") and in an Excel spreadsheet referred to by desk adjusters as the "tracker." *Id.* at 109:17–110:13. Desk adjusters use the CMS software to document file notes, contacts with policyholders, inspections performed, and whether a claim was settled or withdrawn—information that CRU then provides its clients. *Id.* at 55:2–8.

Plaintiffs and the other desk adjusters receive remuneration statements or deposit reconciliation reports, showing the days worked for Defendants and their applicable day rate. *Id.* at 105:11–12).[17] Defendants used these statements or reports to pay Plaintiffs and other desk adjusters. *Id.*[18]

When asked about the factual bases for CRU's claim that CRU was not, in fact, an *employer* of Plaintiffs, Repinski stated that Plaintiffs were not employees, *id.* at 107:8, because: "They signed up on our independent contractor roster," *id.* at 107:12–13; "They signed an agreement as an independent contractor," *id.* at 107:13–14; "They were free to leave, if they wanted to leave," *id.* at 107:14–15; "They had . . . the portability, the mobility of an independent contractor," *id.* at 107:15–16; and "[t]hey can negotiate. Not that -- they don't always prevail, but they can push back

---

[17] *See, e.g.*, Ex. W, Remuneration Statement.
[18] *See, e.g,* Ex. V, Paystub.

on their pay, they can negotiate their pay," *id.* at 107:19–22. "Nothing else comes to mind," Repinski concluded. *Id.* at 107:23–24.

However, CRU's own discovery responses take issue with Repinski's description of desk adjusters having "mobility" and being "free to leave": Pursuant to the applicable independent contractor agreements, should an independent contractor prematurely terminate the agreement (i.e. without 30 days' written notice) the independent contractor agreement may be subject to a penalty of the greater of the actual costs incurred as a result of the premature filing or $2,500." Ex. R at 10; Ex. S at 10. In fact, in the last two years, CRU has actually increased the amount of notice required of desk adjusters. "Prior to 2021, the policy mentioned in response to the previous Interrogatory required three weeks (rather than 30 days') notice and subjected the independent contractor to a penalty of up to $4,000. Ex. R at 10; Ex. S at 10.

Repinski's testimony also exposed stark differences between what CRU represented to desk adjusters on paper and the practical working conditions. For example, while the CRU independent contractor agreement states that the desk adjuster "shall [have] the right to set Contractor's work schedule," Ex. T at 3, in reality Repinski said that was only "to the extent it's allowable by that client under [the] circumstances." Ex. G, Repinski Dep. 125:22–126:1. Similarly, while the CRU independent contractor agreement states that the desk adjuster "shall have the right to perform services for others," Ex. T at 3, Repinski explained that "[t]here is a practical issue of, if you're working -- if you're deployed for us, it's going to be really, really hard for you to be deployed for somebody else at the same time. . . . [W]e would like to be your sole supplier, in terms of work during the deployment period" Ex. G, Repinski Dep. 123:18–25.

### Deposition testimony of Adam Dickens, CRU Senior Vice President

Testimony from CRU's Senior Vice President, Adam Dickens, also shows that potential plaintiffs are similarly situated in terms of supervision/monitoring, training, software used, schedule/hours, classification, and pay.

Dickens testified that desk adjusters are expected to work a certain number of claims each week. Ex. H, Dickens Dep. 90:24–91:2. If they do not meet those requirements, they could be

"released" (i.e., terminated) by CRU. *Id.* at 91:4–7. Similar to the explanation provided by Repinksi, these requirements are in place because CRU is penalized if desk adjusters do not meet the deadlines specified in its contracts with clients. *Id.* at 44:1–6; 44:11–13. CRU has to carefully monitor and control the work of desk adjusters, because "if the desk adjusters don't complete certain activities on their files, it can result in CRU being paid less money for that work." *Id.* at 49:15–18. To ensure desk adjusters complete this work, CRU empowers team leads and managers who supervise desk adjusters to require them to handle a certain number of claims per day. *Id.* at 92:3–8.

Desk adjusters perform their work on laptops issued by CRU's clients, *id.* at 55:13–17, are required to undergo Internet-based training and on-boarding, *id.* at 65:14–22, document activity on claims in claims tracking software, *id.* at 53:12–14, and report their work to CRU in an Excel spreadsheet tracker. *Id.* at 87:2–5.

CRU requires desk adjusters who work remotely, *id.* at 61:21–25, to be available and performing work according to a schedule set by CRU and its clients. For example, desk adjusters working under CRU's contract with TD Insurance are required to be available and performing work *at a minimum* from 8 a.m. to 5 or 6 p.m. local time, Monday through Saturday. *Id.* at 94:24–96:2. If they do not, CRU can terminate them. *Id.* at 96:7–11.

Like Repinski, Dickens confirmed that desk adjusters working under CRU's contract with TD Insurance were previously classified as 1099 independent contractors and paid on a day rate, *id.* at 102:25–103:11, but were recently reclassified as W-2 employees paid hourly and eligible for overtime. *Id.* at 75:4–19.

### Additional evidence from Defendants

During preliminary discovery, Defendants were asked if they:
contend that Plaintiffs and the PCMs[19] are not similarly situated for the purpose of proceeding collectively under the FLSA? If so, please state each ground for such

---

[19] Plaintiffs defined "Putative Class Members" as "Desk Adjusters who worked for Defendant(s) and were classified as independent contractors at any time from December 27, 2019, through the final disposition of this matter." Ex. Q at 7.

> contention and identify and describe the specific legal and factual bases for each ground.

Ex. Q at 12. Defendants make a number of objections and state that they will "interpret this Interrogatory as seeking a general description of [Defendants'] position that Named Plaintiffs and/or Opt-in Plaintiffs are not similarly situated." Ex. R at 11; Ex. S at 11–12. Defendants acknowledge that "[w]hile the Named Plaintiffs and the Opt-in Plaintiffs may have performed similar job duties," they deny they are similarly situated or have similar claims. Ex. R at 11–12; Ex. S at 12. Recognizing that "discovery is ongoing, and depositions have not yet occurred," CRU/CRU USA stated it would "supplement its response to this Interrogatory as responsive information is discovered." Ex. R at 11–12; Ex. S at 12. Discovery is complete, depositions have now occurred, and Defendants have failed to supplement their response to identify any factual bases for why Plaintiffs and potential plaintiffs are not similarly situated.

### **Evidence from Plaintiffs**

Deposition testimony and discovery responses[20] from the three Named Plaintiffs and five Opt-In Plaintiffs in the case further confirm their work as desk adjusters for CRU was similar to other potential plaintiffs in that they were subject to a level of control and supervision by CRU indicative of an employer–employee relationship, such that they, for example:

- were provided with laptops to use for their work;[21]
- had set *minimum* hours they were required to work;[22]
- were told they could not work a second job;[23] and
- had to request permission to take time off.[24]

---

[20] *See generally* Exs. I–P.
[21] Ex. A, Ruise Dep. 29:20–24; Ex. B, Riley Dep. 107:12–18; Ex. C, Lundy Dep. 40:2–12; Ex. D, James Dep. 126:16–22; 178:9–14; Ex. E, Mays Dep. 107:1–6.
[22] Ex. B, Riley Dep. 156:6–158:18 (scheduled to work 10 hours a day); Ex. C, Lundy Dep. 127:25–128:18 ("10 a.m. to 8 p.m."); 161:14–20 (7 a.m. to 5 p.m. on hurricane work); Ex. D, James Dep. 158:13–159:12 ("8 a.m. to 6 p.m."); 211:25–212:5 (would get a call if not logged on to Microsoft Teams by 8:05 a.m.).
[23] Ex. A, Ruise Dep. 281:19–283:2; Ex. B, Riley Dep. 183:11–25; Ex. E, Mays Dep. 232:10–233:17; 238:18–24; Ex. F, Nickelberry Dep. 200:3–20; 201:22–25.
[24] Ex. A, Ruise Dep. 295:17–23; Ex. B, Riley Dep. 222:10–23; Ex. C, Lundy Dep. 201:17–21; Ex. D, James Dep. 160:20–161:14.

**B.     Defenses Available to Defendants**

During discovery, Defendants were asked to identify all individualized defenses they believe apply to any particular putative class member, the putative class member they allege it applies to, and the facts which they allege support the individualized defense. Ex. Q at 13. Buried in the middle of numerous objections asserted by Defendants is an important sentence that might be easy to overlook: "Unless and **until a collective is conditionally identified and/or certified**, [Defendants] cannot determine who is a member of the collective and therefore **cannot identify its defenses against such individuals**." Ex. R at 12; Ex. R at 12 (emphasis added). Plaintiffs have already *identified* the individuals making up the proposed collective[25]—as have Defendants[26]—this begs the question: are Defendants saying that until the Court *certifies* a collective, they cannot identify their defenses against individuals in the proposed collective? Were that true factually (or permissible legally), it would render preliminary discovery meaningless. But if Defendants' forthcoming response in opposition to this motion identifies *individual defenses* against members of the proposed collective, what then? After seven-plus months, the time for preliminary discovery—including discovery of Defendants' individualized defenses—is over.

Defendants' failure to identify any individualized defenses here, coupled with their failure to answer Plaintiffs' interrogatory as to whether Plaintiffs and potential plaintiffs were similarly situated (or timely supplement their answer pursuant to the Federal Rules of Civil Procedure), *see supra*, are blatantly unfair and prejudicial to Plaintiffs. This is not how FLSA collective actions work, pre-/post-*Swales*, and the Court cannot countenance such obfuscation by allowing

---

[25] *See* definition of "Putative Class Members," Ex. Q at 7.
[26] During written discovery, Plaintiffs requested Defendants identify putative class members and provide certain information and documents for each. Defendants objected, but the Parties ultimately reached a compromise where Defendants compiled a list of 200 individuals fitting Plaintiffs' description of a putative class member and submitted a list of those individuals *initials* to Plaintiffs. Plaintiffs chose 25 individuals from the list and Defendants provided Plaintiffs with names and available contact information for those individuals. Clearly Defendants knew the *identity* of the proposed collective in order to compile the list of 200 individuals as agreed upon.

Defendants to rely on "newly discovered" individualized defenses that were indeterminable only a few months ago.

Defendants attempted to answer the interrogatory above with respect to the Named and Opt-in Plaintiffs, but critically missing in their response is the *individual* part of "individual defenses." Defendants refer to the defenses raised in their Original Answer, all of which are asserted *universally* against Plaintiffs and/or Putative Class Members. *See* ECF 13 at 6–9. The documents Defendants refer to in support of their defenses—IRS Form 1099s, paystubs, Independent Contractor Agreements, and Independent Contractor Onboarding Packets—apply uniformly to all Plaintiffs and potential plaintiffs. Ex. R at 12; Ex. S at 12–13.

Defendants readily admit that the independent contractor defense applies to *all* Named Plaintiffs and Opt-in Plaintiffs during the relevant time period. Ex. R at 18; Ex. S at 19. *See, e.g.*, *Snively v. Peak Pressure Control, LLC*, 314 F. Supp. 3d 734, 741 (W.D. Tex. 2018) (raising the same defense against all plaintiffs "lends support to the notion that Plaintiffs are similarly situated" and pointing out that "many of the specific fact questions cited by Defendants apply to each Plaintiff—i.e., Defendants raise the same defenses against most, if not all, Plaintiffs"). CRU's arguments supporting their independent contractor defense apply on a group basis and are largely based on common evidence and legal analysis. *See, e.g, Snively*, 314 F. Supp. 3d at 742 ("[A]lthough [a defense] may require specific factual inquiries about each Plaintiff," because defendants assert the same defense against all plaintiffs, "collective treatment is less problematic."); *see also Badon v. Berry's Reliable Res., LLC*, No. 19-12317, 2021 U.S. Dist. LEXIS 45688, at *9 (E.D. La. Mar. 11, 2021) (finding workers to be similarly situated where defendant's affirmative defense, that the workers were independent contractors, was asserted universally against each plaintiff and opt-in). The common questions of fact present in the economic realities test can be answered on a class basis because the facts and evidence are the same for the Plaintiffs and potential plaintiffs.

In *Sterling v. Greater Hous. Transp. Co.*, No. 4:20-CV-0910, 2021 U.S. Dist. LEXIS 133231 (S.D. Tex. Jul. 14, 2021), Chief Judge Lee Rosenthal of the United States District Court

for Southern District of Texas, certified a class of drivers alleging misclassification under the FLSA when deposition testimony showed that the plaintiffs "all had the same job title, performed the same duties, were paid under the same compensation arrangements, wore the same uniforms, followed the same policies and procedures, were subject to the same hiring requirements, completed the same training, were supervised in the same way, were subject to the same level of control, and were required to follow identical" contracts. *Id.* at *7. While the defendant was able to identify "some differences in job duties" between the drivers, it did not show that these differences would "require individualized proof or determination material to the employment status" of the plaintiffs. *Id.* "Similar, immaterial differences are not disqualifications for finding employees who are similarly situated." *Id.* at *8 (citations omitted). Ultimately, Chief Judge Rosenthal granted certification because "the potential members' claims center[ed] on the same facts and evidence as to whether the drivers are employees or independent contractors." *Id.* at *8–9 (citing *T.S. v. The Burke Foundation*, No. Civ. A. 1:19-CV-809, 2021 WL 1807994 (W.D. Tex. Feb. 22, 2021)). "When 'the plaintiffs all have the same job description and the allegations revolve around the same aspect of that job,' certification should be granted." *Id.* at *5–6 (quoting *Swales*, 985 F.3d at 441–42).

The question here is the same as in *Sterling*: "whether the court can determine if the named plaintiffs and proposed class members are employees or independent contractors on a class-wide basis." *Id.* at *6 (citing *Miller v. Mackey Intern., Inc.*, 452 F.2d 424, 427 (5th Cir. 1971) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of [class certification] are met.").

As thoroughly detailed above, *see supra* Section III.A, Plaintiffs have sufficiently shown on the current record that the Court can determine the relevant threshold issues on a class-wide, rather than individualized, basis. Deposition testimony from Plaintiffs and Defendants show that CRU desk adjusters all had the same job title, performed the same duties, were paid under the same compensation arrangements, followed the same policies and procedures, were subject to the same

hiring requirements, completed the same training, were supervised in the same way, were subject to the same level of control, and signed the same contracts.

C.    **Fairness and procedural considerations make collective resolution ideal and efficient.**

In *Sperling v. Hoffman-La Roche*, 110 S. Ct. 482 (1989), the Supreme Court explained that collective actions permit "plaintiffs the advantage of lower individual costs to vindicate their rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged . . . activity." *Id.* at 485. A collective action is favored because it serves the legitimate goals of avoiding a multiplicity of duplicative lawsuits and expediting disposition of the action. *Id.*

As is the case here, the judicial system clearly benefits by the efficient resolution, in one proceeding, of common issues of law and fact arising from the same unlawful conduct. The misclassification of the CRU desk adjusters was uniform. Further, the number of potential plaintiffs in this case is believed to be in the hundreds. It would burden the Court to resolve numerous cases addressing the same claims with the same facts and evidence. The fact that 13 CRU desk adjusters have filed consents demonstrates class interest. Moreover, the compensation paid to Plaintiffs and potential plaintiffs is also easily identified by the records. Thus, a collective action is the ideal means to resolve the claims of Plaintiffs and potential plaintiffs.

## IV.    PROPOSED NOTICE

Plaintiffs request Defendants be ordered to produce within fourteen (14) days of the granting of this Motion an Excel (.xls) file containing the names, all known addresses, all email addresses, all telephone numbers (home, mobile, etc.), and beginning and ending dates of their working relationship with Defendants of all individuals who worked for CRU as Desk Adjusters in the United States, were classified as independent contractors, and were compensated on a day rate basis within the three-year period preceding the filing of this lawsuit. Telephone numbers will be used only for text message notice and to verify contact information for Class Members in the event that the initial notice is returned undeliverable. *See Joaquin v. Hinojosa*, 219 F. Supp. 3d 582, 587 (W.D. Tex. 2016) (ordering disclosure of phone numbers).

Plaintiffs request leave to send the Notice and Consent forms (attached as Exhibit X) via first-class mail, and the proposed notice (attached as Exhibit Y) via email and (Exhibit Z) via text message[27] to all identified class members. Plaintiffs request leave to maintain a website that is limited to posting the content of the approved Notice and Consent Form (attached as Exhibit X).[28] The methods of notice requested by Plaintiffs are deemed appropriate and reasonable, where other methods of notice would be insufficient, such that an alternative proposed notice methods are necessary to ensure timely notice is effectuated. Courts also find text messaging to be an appropriate means of notice, particularly where there is evidence that text messaging is a form of communication previously used by the employer to communicate with its employees.[29] Here, text message is a form of communication previously used by Defendants in communicating

---

[27] "In the world of 2017, email and cell phone numbers are a stable, if not primary, point of contact for the majority of the U.S. population, and thus that [sic] using email and texts to notify potential class members is entirely appropriate." *Vega v. Point Security, LLC*, No. A-17-CV-049-LY, 2017 U.S. Dist. LEXIS 148105, at *12, 2017 WL 4023289, at *4 (W.D. Tex. 2017); *see also Eltayeb v. Deli Mgmt.*, No. 4:20-CV-00385, 2021 U.S. Dist. LEXIS 3484, at *12 (E.D. Tex. Jan. 8, 2021) (Mazzant, J.) ("under . . . the current state of technology, text message notification is a proper means of effectuating notice to the potential plaintiffs").

[28] *See, e.g.*, *Black v. SettlePou, P.C.*, 2011 WL 609884, at *6 (N.D. Tex. Feb. 14, 2011) (Plaintiff's counsel "is authorized to maintain an internet website for the purpose of informing similarly situated persons of their right to opt into this litigation."); *Beall v. Tyler Techs., Inc.*, Civil Action No. 2:08–CV–422, 2009 WL 1766141, *3–4 (E.D. Tex. June 23, 2009) (permitted the posting of notice on a website, "to be maintained by the plaintiffs' counsel" in a FLSA collective action); *Florence v. Deli Mgmt.*, No. 1:18-cv-4303-SCJ, 2019 U.S. Dist. LEXIS 4379, at *10 (N.D. Ga. Jan. 9, 2019) ("Plaintiff may maintain a website with an online portal that allows for the submission of electronically-signed consents."); *Sellers v. Sage Software, Inc.*, No. 1:17-CV-03614, 2018 U.S. Dist. LEXIS 188420, at *16 (N.D. Ga. May 25, 2018) (approving submission through online portal of electronically-signed consent forms, collecting cases within this district); *DePyper v. Roundy's Supermarkets, Inc.*, No. 20-cv-2317, 2020 U.S. Dist. LEXIS 208664, at *16 (N.D. Ill. Nov. 9, 2020) (email notice to include a hyperlink as opposed to attaching PDF due to finding that PDF attachment may cause email to be flagged as spam).

[29] *See Goss v. Tyler Traditions, Inc.*, No. 6:18-CV-423-JDK, 2019 U.S. Dist. LEXIS 175693, at *16–17 (E.D. Tex. July 22, 2019) (Kernodle, J.) (authorizing notice to be disseminated via text message) (citing *Kidwell v. Ruby IV, LLC*, No. 18-2052, 2019 U.S. Dist. LEXIS 7663, at *6 (E.D. La. Jan. 16, 2019); *Butler v. TFS Oilfield Servs., LLC*, No. SA-16-CV-1150-FB, 2017 U.S. Dist. LEXIS 218126, at *20 (W.D. Tex. Sep. 26, 2017) (citing *Bhumithanarn v. 22 Noodle Mkt. Corp.*, No. 14-cv-3624 (RJS), 2015 U.S. Dist. LEXIS 90616, at *12 (S.D.N.Y. July 13, 2015) (allowing notice by text message where defendants use text messaging as a preferred method of employee communication)).

with its workers—potential class members. Plaintiffs requests this Court to permit notice to be sent via text message with a link to the website where the proposed notice and consent form will be posted. *See Cervantez v. TDT Consulting, LLC*, 2019 U.S. Dist. LEXIS 142907, at *34 (N.D. Tex. July 22, 2019) (granting "request to distribute the Notice through mail, mail, text message and granting [Plaintiff's] request that potential opt-in plaintiffs be afforded the opportunity to electronically sign their consent forms on the proposed website."). Plaintiffs requests a sixty (60) day opt-in period from the initial date of transmitting the notice forms via mail, email, and text.

It is well-documented that people often disregard collective action notices. *See* Andrew C. Brunsden, *Hybrid Class Actions, Dual Certification, & Wage Law Enforcement in the Federal Courts*, 29 BERKELEY J. EMP. & LAB. L. 269, 295 (2008). Courts routinely approve reminder notice.[30] Therefore, Plaintiff requests permission to send a reminder notice (attached as Exhibit AA) via first-class mail and resending the approved notices via email and text message after the passage of thirty (30) days. *See, e.g.*, *Contreras v. Land Restoration LLC*, 2017 WL 663560, *9 (W.D. Tex. 2017) (permitting reminder notices); *Frazier*, 285 F. Supp. 3d at 979-80 (permitting reminder notice within the thirty (30) days after the initial mailing).

## V. CONCLUSION

Accordingly, Plaintiffs respectfully request this Court to grant the relief set forth above. Plaintiffs further request all such other relief to which they may be justly entitled.

> Respectfully submitted,
>
> *Kerry O'Brien*
>
> **Kerry V. O'Brien**
> Texas Bar No. 24038469

---

[30] *See, e.g., Weinstein v. 440 Corp.*, No. 2:19-cv-105, 2019 U.S. Dist. LEXIS 190678, at *12 (N.D. Ga. Nov. 4, 2019) (authorizing a reminder notice to restaurant workers); *Florence v. Deli Mgmt.*, No. 1:18-cv-4303, 2019 U.S. Dist. LEXIS 4379, at *9 (N.D. Ga. Jan. 9, 2019) (authorizing reminder notices via mail and email).



1011 Westlake Drive
Austin, Texas 78746
phone: (512) 410-1960
fax: (512) 410-6171
email: ko@obrienlawpc.com

**LEAD COUNSEL FOR PLAINTIFFS**

*/s/ Travis Gasper*
**Travis Gasper**
Texas Bar No. 24096881
GASPER LAW, PLLC
1408 N. Riverfront Blvd., Suite 323
Dallas, Texas 75207
phone: (469) 663-7736
fax: (833) 957-2957
email: travis@travisgasper.com

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that on November 28, 2023, a true and correct copy of the foregoing document was filed through the Court's electronic case filing system, which will serve a copy of this document on all counsel of record.

**Kerry V. O'Brien**