**David John Repinski**

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3   C.M. COLLINS, N.J. LUNDY,     )
     and R.C.L. MAYS,              )
 4   individually, and on          )
     behalf of all others          )
 5   similarly situated,           )
                                   )
 6            Plaintiffs,          ) CIVIL NO.
                                   )
 7   v.                            ) 4:22-CV-1073-SDJ
                                   )
 8   CATASTROPHE RESPONSE UNIT,    )
     INC. and CATASTROPHE          )
 9   RESPONSE UNIT USA, INC.,      )
                                   )
10            Defendants.          )
                                   )
11
12         ----------------------------------
13                 ORAL DEPOSITION OF
14                 DAVID JOHN REPINSKI
15                  AUGUST 28, 2023
16         ----------------------------------

17       ORAL DEPOSITION OF DAVID JOHN REPINSKI, produced as

18   a witness at the instance of the Plaintiffs, and duly

19   sworn, was taken in the above-styled and numbered cause

20   on August 28, 2023, from 9:33 a.m. to 2:38 p.m., before

21   Nita G. Cullen, CSR in and for the State of Texas,

22   reported by machine shorthand, at the law offices of

23   Hallett & Perrin, P.C., 1445 Ross Avenue, Suite 2400, in

24   the City of Dallas, County of Dallas, State of Texas,

25   pursuant to the Federal Rules of Civil Procedure.
```

**David John Repinski**

45

1  Q.  I want to read to you a list of job duties, and
2  I want you to tell me if this is a good description of
3  just general job duties, again, kind of that high level
4  that we were talking about, for desk adjusters.
5  Investigating loss details, completing coverage
6  analysis, settling or paying claims, i.e.,
7  reimbursement, cash payout, et cetera, and compiling
8  subrogation packages, if necessary.
9      A.  I think that's fair.  The first one on that
10 list might fall to the field adjuster.  It depends on
11 the specific event and the client involved.
12          (DEPOSITION EXHIBIT 4 MARKED.)
13     Q.  (By Mr. Gasper)  I'm going to hand to you what
14 we are marking as Plaintiff's Exhibit No. 4.
15     A.  Thank you.
16     Q.  For the record, this is a document produced by
17 the Plaintiffs.  It's Bates numbered Plaintiffs 266 to
18 268.  I'll give you a minute to look through that, and
19 once you've had a chance to review, please let me know,
20 and I just have a few questions.
21     A.  Okay.
22     Q.  Is this one of the documents that you reviewed
23 in preparation for today?
24     A.  I may have.  I don't recall seeing it.  It is
25 prior to -- what did you call -- the lookback period.

**David John Repinski**

47

1  adjusters?
2      A.  I find that question confusing.  This is a
3  service that we provide to our clients to generate
4  revenue.  So if you're asking me if we could forego this
5  line of business, we could, we would forego revenue and
6  we would be a less -- less of a full service provider to
7  our clients.  But conceivably, could we avoid providing
8  desk adjusting services?  Perhaps.  It would
9  significantly diminish our value proposition in the
10 market.
11     Q.  Could you provide the same level of services to
12 clients as you do now without these desk adjusters?
13     A.  Can you restate that?
14     Q.  Sure.  If CRU didn't have the desk adjusters
15 that we've been talking about, could it still deliver
16 the same level of services to clients?
17     A.  Clearly not.
18     Q.  Okay.  So, these desk adjusters are essential
19 to the services that CRU provides its clients.
20     A.  They are central to our current value
21 proposition, yes.
22     Q.  What's a typical day like for a desk adjuster?
23     A.  That depends, which client they're working for,
24 which event they're responding to, what role they're in.
25 There are so many variables associated with that.

**David John Repinski**

48

1      Q.  Is there anything that desk adjusters have in
2  common regarding -- despite the various clients or roles
3  or events?
4      A.  Sure.
5      Q.  What is that?
6      A.  Typically, telephone outreach with claimants
7  and/or insureds, updating the file notes and claims
8  management system for the client or clients that they're
9  serving, receiving direction and redirections around
10 policy wordings, endorsements, productivity from above.
11     Q.  And "from above," what does that mean?
12     A.  That would be within the hierarchy of that
13 particular team that they're working for.  It may --
14 that may start with CRU management, it may -- most often
15 comes from the client.
16     Q.  Are desk adjusters required to check in, in the
17 morning, at the start of their shift?
18     A.  That depends.
19     Q.  How so?
20     A.  It depends on are they all working at the same
21 place in the same room?  If you go back certainly during
22 the -- forgive me, what did we call -- not the lookback.
23 What did we call the --
24     Q.  Relevant time period.
25     A.  Relevant time period.  You're going to probably

**David John Repinski**

51

1  interrogatory responses said that they were all required
2  to check in over Teams, Microsoft Teams in the morning
3  and just with something like "good morning" to let their
4  team lead know that they were -- at the start of their
5  shift that they were on the job.  Do you recall reading
6  anything like that?
7          MR. HURST:  Objection, form.  Go ahead.
8      A.  I do.
9      Q.  (By Mr. Gasper)  And was that typical for desk
10 adjusters?  Was that a requirement?
11         MR. HURST:  Same objection.
12     A.  Was it a requirement during what period,
13 specifically?
14     Q.  (By Mr. Gasper)  Any time between December 2019
15 and the present.
16         MR. HURST:  Same objection.
17     A.  Sure.  So, going back to what I just mentioned
18 about the transition or the evolution of this from a
19 show up, sit in our office workforce to a go to the
20 Marriott Courtyard in Markham, Ontario, sit in a bubble,
21 to work from home, that certainly took place.
22     Q.  At what point?
23     A.  Work from home.
24     Q.  Work from home.  Okay.  And in terms of a
25 typical day, I know you said it depends, but was it

**David John Repinski**

Page 52

```
 1  typical for the desk adjusters to have daily morning
 2  meetings?
 3       A.  At times, it was, sure.
 4       Q.  And, again, I'll represent to you, I believe
 5  most if not all of the Plaintiffs in the responses said
 6  they all had daily morning meetings ranging from 30
 7  minutes to two hours.  Is that something you're familiar
 8  with?
 9       A.  Familiar with it in terms of them saying that,
10  and yes, I'm familiar with that there were morning
11  meetings.  I'm also very familiar with why we had to
12  adopt that.
13       Q.  And why is that?
14       A.  So, you have a situation where we negotiate
15  with our client, in this case TD, how many adjusters we
16  will send to respond to an event.  And there are extreme
17  time based and -- time based SLAs placed on us, in terms
18  of claims closure rate.
19            They want extreme care for their
20  policyholder.  First and foremost, TD is a bank, so
21  arguably they are particularly concerned with
22  policyholder outcome because if they upset a
23  policyholder, they also upset a banking customer who may
24  also influence a commercial banking relationship.
25            So they are very customer focused.  So we
```

**David John Repinski**

Page 53

```
 1  agree on the number of adjusters we will deploy, and
 2  they say, great, we want and expect this outcome from
 3  you by this date.  If we don't hit that, there can be
 4  fines and penalties in our contract for what's perceived
 5  to be poor service.
 6            And again, we're dealing with policyholders
 7  who have had something significant happen to them; a
 8  wildfire, a flood, a hailstorm, whatever that may be.
 9  They were nervous about allowing us to have -- well,
10  you're going to use American adjusters working from
11  home.
12            We're going to have to tell our superiors
13  here within TD Insurance and the bank that we've allowed
14  a remote workforce, when we've never done this before,
15  to work from their respective homes.  We can't see them,
16  so we have to know that they're all in their places and
17  that they're working and that we're getting the outcomes
18  that we deserve and we had promised our policyholders.
19       Q.  Okay.  Do you know what would be discussed in
20  those daily morning meetings?
21       A.  I don't.  I've never attended one.
22       Q.  Were desk adjusters required to clock in and
23  out for lunch?
24       A.  I would not say clock in or clock out.  Desk
25  adjusters -- we had expectations placed on us, as far as
```

**David John Repinski**

Page 54

```
 1  when the workforce would be available, time zone
 2  coverage.  They are prone to receiving callbacks from
 3  policyholders who are perhaps distraught about their
 4  claim, maybe angry about their claim, who have
 5  questions, and so we have to make sure that there's
 6  appropriate coverage during that time period, and we
 7  can't have everybody go to lunch at the same time.
 8       Q.  Okay.  Do you know how desk adjusters would
 9  communicate to their team lead when they would go out to
10  lunch -- when they would take a lunch break, if any?
11       A.  I don't.
12       Q.  Is it possible that they would have --
13  similarly to kind of checking in in the morning in
14  Teams, maybe sending a message in Teams, like "going to
15  lunch"?
16       A.  I would assume that some did that.  There were
17  probably various communication methods used.
18       Q.  And similarly, at the end of the day, are you
19  aware that desk adjusters would -- are required to check
20  out in Teams, just saying "goodbye" or --
21       A.  I'm not aware.
22       Q.  What software programs do desk adjusters use?
23       A.  It depends.
24       Q.  On?
25       A.  It depends on the client, and it can depend on
```

**David John Repinski**

Page 55

```
 1  the underlying event, what type of event it was.
 2       Q.  What are some of the software programs they
 3  use?
 4       A.  So, our clients will use what they would
 5  affectionately refer to as a CMS or Claims Management
 6  System.  They would expect us to update their CMS with
 7  file notes, first contact, inspection performed, claim
 8  settled, claim withdrawn, insured just called and said
 9  they're going to be out of town for two weeks, can they
10  delay the inspection?
11            So, somebody else could pick up the file
12  and look at it and understand where it is, particularly
13  our client.  If it's a property claim, property
14  estimates are written in, generally, one of two
15  platforms.  One is called Xactimate, that's spelled with
16  an X, it's X-A-C-T-I-M-A-T-E, the second is called
17  Symbility, S-Y-M-B-I-L-I-T-Y.  If there are automobiles
18  involved, there are various platforms used for auto
19  claims.  I know some of them, I don't know all of them.
20       Q.  What is Guidewire?
21       A.  Guidewire is a company that produces a CMS.
22  So, many insurance companies, particularly in Canada,
23  use Guidewire.  They use it for underwriting, they use
24  it for policy management, and there's a claims module
25  that they use.
```

David John Repinski

56

1             So, if we are working for a Guidewire
2   client, it's just another way of saying -- if the client
3   says, "update our claim system," they may say, "update
4   Guidewire."  Guidewire is a claims management system.
5        Q.   How would the team leads or managers
6   communicate with desk adjusters?
7        A.   I have to assume there were several different
8   ways; either through Teams, telephone, e-mail.
9        Q.   What was CRU's process for recruiting
10  Plaintiffs and desk adjusters?
11       A.   So, we do several things to recruit adjusters.
12       Q.   Okay.
13       A.   Would you -- assuming you're asking me to
14  elaborate on that?
15       Q.   Yes, please.
16       A.   We attend various conferences where adjusters
17  frequent and look for companies to sign on with as
18  contractors.  We advertise on social media.  We belong
19  to various Facebook groups.  We will send out notices,
20  hey, we need adjusters for a certain event in a certain
21  area.  Word of mouth is a tactic, as well.
22       Q.   What are some of the conferences that you
23  attend?  Just like the biggest?
24       A.   That I personally attend or that CRU attends?
25       Q.   That CRU.

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                          swreptproduction@swreporting.com

David John Repinski

57

1        A.   With respect to --
2        Q.   Recruiting.
3        A.   The biggest, the most significant one for
4   recruiting of adjusters, it's NACA, N-A-C-A, which
5   stands for the National Association of Catastrophe
6   Adjusters, takes place in January.
7        Q.   And where does it take place?
8        A.   It varies.  It's traditionally been Las Vegas.
9   They've decided to move to Reno in 2024, and somewhere
10  in Florida in 2025.
11       Q.   Not bad places to be in January, huh?  You said
12  advertising on social media.  What platforms?
13       A.   LinkedIn, we're in various Facebook groups.  We
14  have a Facebook page, I think.  I'm not on Facebook.  I
15  don't know whether they have an Instagram account.
16       Q.   Do you know if any of these advertisements on
17  LinkedIn or Facebook groups have been produced in
18  discovery?
19       A.   I don't know.
20       Q.   You said you send notices.  How do you send
21  notices?  Is that -- or tell me what that process is.
22       A.   To whom, specifically?  Is this with respect to
23  recruiting?
24       Q.   Yes.  With respect to recruiting.
25       A.   We will put something on social media saying,

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                          swreptproduction@swreporting.com

David John Repinski

65

1   that our client needs you for, for this role?
2        Q.   I want to talk about the onboarding process for
3   desk adjusters.  Do you require a background screening?
4        A.   At times, our clients require a background
5   screening.
6        Q.   But CRU itself does not.
7        A.   No.
8        Q.   What about drug testing?
9        A.   I'm only aware of one client that requires drug
10  testing.
11       Q.   CRU does not.
12       A.   No.
13       Q.   Do you require the desk adjuster to have
14  insurance coverage?
15       A.   Yes.
16       Q.   And that's a CRU requirement.
17       A.   Yes.
18       Q.   What paperwork does the desk adjuster fill out
19  during the onboarding process?
20       A.   That depends.
21       Q.   On the client?
22       A.   The client, perhaps the specific deployment as
23  it relates to the country in which they're working, but
24  it's mainly governed by the client.
25       Q.   Are there any -- is there any paperwork that

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                          swreptproduction@swreporting.com

David John Repinski

66

1   CRU requires all desk adjusters -- or CRU requires all
2   desk adjusters to fill out?
3        A.   I believe so, yes.
4        Q.   And what would that be?
5        A.   The specific independent contractor agreement
6   associated with that deployment.
7        Q.   Anything else?
8        A.   There are times that we send a packet.  I don't
9   know if it's called a welcome packet or an informational
10  packet that conveys some of our policies, some of our
11  corporate policies.  There are some clients that require
12  specific -- other specific policies be issued before
13  anybody can deploy on their behalf.
14       Q.   Do you know if TD is one of those clients that
15  requires specific policies?
16       A.   They do.
17       Q.   Do you know if those TD specific policies or
18  the required specific policies have been produced by CRU
19  in discovery?
20       A.   I don't know whether they have or not.
21       Q.   As part of the onboarding process, is there a
22  component of an IT setup?  Is that part of it?
23       A.   That depends.
24       Q.   On?
25       A.   It depends on the client.

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                          swreptproduction@swreporting.com

**David John Repinski**

Page 67

```
 1    Q.  Okay.
 2    A.  It depends on whether that client requires us
 3  to work in their system and utilize their hardware, and
 4  it also depends on the role, am I doing property or
 5  auto?  What systems am I going to need access to?
 6    Q.  Do most clients require work in their system?
 7    A.  I'm hung up on the word "most."
 8    Q.  Or how would you describe the breakdown of
 9  clients that require work in their system versus those
10  that don't?
11    A.  I think it's safe to say that most Canadian
12  clients are requiring desk adjusters to work in their
13  system.  We don't do as much desk work in the U.S.,
14  so -- and I don't think it's as prevalent in the U.S. at
15  the moment.
16    Q.  Are there any training videos that new desk
17  adjusters have to watch?
18    A.  When you -- can you define what you mean by
19  "new desk adjusters"?
20    Q.  A desk adjuster that has just been added to the
21  roster.
22    A.  No.
23    Q.  What about a desk adjuster that has just
24  accepted a deployment?
25    A.  Most often.
```

**David John Repinski**

Page 68

```
 1    Q.  And does that come from CRU, the client, or
 2  both?
 3    A.  Just so you know, we don't trade as CRU, it is
 4  CRU --
 5    Q.  I'm sorry.
 6    A.  No.  There's no apology, I just want to help
 7  you with that.  We provide the certification, these
 8  videos as required by our client.  So in the case, for
 9  example, of TD, these would be -- these would be things
10  that TD says, we want the desk adjusters to see these,
11  to go through this.
12    Q.  But no training videos that -- specific to or
13  that come from CRU.
14    A.  To --
15    Q.  It's all from the client versus something that
16  was developed or required by CRU.
17    A.  If you have accepted a deployment, there may be
18  some modules -- some online modules that we need you to
19  watch, yes.
20    Q.  And what would those topics cover?
21    A.  It would be their -- it could be things ranging
22  from, this is how you work in our claim system, this is
23  our version of Guidewire, because it's usually
24  customized.  This is what's unique about ours.  This is
25  what's expected of you, in terms of policyholder
```

**David John Repinski**

Page 77

```
 1  manager.  It could be, in the case of TD, the TD team
 2  lead.
 3    Q.  How were the rates of pay communicated to the
 4  desk adjusters?
 5    A.  I don't know, but I -- based on what typically
 6  happens, when they call up to vet the adjuster, to say,
 7  would you be interested in this deployment?  It takes
 8  about three seconds for adjusters to say, what does it
 9  pay?  And it's conveyed.  Then it's placed in the
10  contract that they sign to confirm it.
11    Q.  And who actually pays the desk adjusters?
12  Where does the paycheck come from?  What entity?
13    A.  That changed.  That evolved during the period
14  that we're talking about.
15    Q.  And from what to what?
16    A.  From the Canadian company to the U.S. company.
17    Q.  Approximately, when?
18    A.  Either in late '20 or in early 2021.
19    Q.  And why did that change?
20    A.  We changed the contract for U.S. adjusters.
21    Q.  And what changes were made to the contract?
22    A.  Prior to June -- I think it was June of '20,
23  adjusters were signing a Canadian contract and were paid
24  by the Canadian business.  In June of '20, we changed to
25  a U.S. contract for U.S. adjusters, and then we also
```

**David John Repinski**

Page 78

```
 1  changed to paying them through the U.S.
 2    Q.  So, for U.S. contractors, you said June of 2020
 3  you changed to a U.S. contract for U.S. adjusters.
 4  Would those U.S. adjusters be working from home in the
 5  U.S.?
 6    A.  They may be.  We changed that contract for an
 7  American, whether they were working on Canadian soil or
 8  U.S. soil.  We have one contract for Americans,
 9  regardless of which country they're working in.  We have
10  a different contract for Canadians, regardless of which
11  contract they're working in.
12    Q.  Are there different rates of pay among the desk
13  adjusters?
14    A.  I'm sure there are.
15    Q.  And why is that?
16    A.  Well, it's subject to how they're being
17  deployed, what role they're taking.  It may be subject
18  to them negotiating or saying, I'm only going to go if
19  you'll pay me X.  We may call and say, this deployment
20  pays this amount, and you may say, I need more than
21  that, and we might find you valuable from past
22  deployments and want you to do that.  The client at
23  times may say, Travis has done a really good job for us,
24  get Travis back here.
25    Q.  Speaking of the change with TD, independent
```

**David John Repinski**

Page 80

```
 1  there.
 2      A.  I've read what's on page 9.  I have not gone to
 3  page 10.  Are you asking me to?
 4      Q.  No.  Just the bottom of page 9, that Paragraph
 5  (3), please.  And I don't want to -- apologize if I'm
 6  duplicating what we just discussed, but I want to make
 7  sure I'm clear and understanding here.  Why did this
 8  change only apply to adjusters working with TD or
 9  deployed to TD?
10      A.  This was a new deployment for TD, so it was --
11  and it was a new contract with TD, so we were able to
12  make the change with TD at this time.
13      Q.  Are there other clients, other than TD, that --
14  with adjusters making -- getting paid a day rate?
15      A.  There are.  There are some, yes.
16      Q.  And do you recall the names of those clients?
17      A.  Off the top of my head, I don't.  Yeah, well --
18  you know, Allstate Canada and -- yeah, they are paid on
19  a day rate.
20      Q.  Did you make the change with Allstate Canada
21  from day rate to hourly?
22      A.  We are growing our team with Allstate Canada,
23  and we are putting -- we are putting new adjusters out
24  at the moment, and I'm not sure if we're putting them
25  out under the legacy pay or not.
```

Page 82

```
 1      A.  They ultimately acquiesced.  They're not easy
 2  to negotiate with.
 3      Q.  When making that decision, did CRU also
 4  consider whether to change the classification of desk
 5  adjusters from contractors to employees?
 6      A.  We did.
 7      Q.  And what went into that decision-making
 8  process?
 9      A.  The communicative and involved nature of TD and
10  the changing landscape in the U.S., with respect to
11  matters like this -- FLSA matters.
12      Q.  And tell me what you mean by that.
13      A.  This industry has historically paid desk
14  adjusters on a day rate.  It's how it's always been
15  done; by us, by our competitors, and there's a bit of a
16  changing landscape, now, where there's more of an
17  aggressive Plaintiffs' bar that takes issue with that
18  and is saying that's wrong.
19          And there's a changing landscape with that,
20  and I don't want to -- you know, my job is to evolve the
21  business and protect the business.  I believe they're
22  contractors, but I have to do the same thing.  I have to
23  make sure that I'm doing what I can to protect the
24  business and not spend a whole lot of time doing things
25  like this.  So we set up a special class of employee and
```

Page 83

```
 1  are placing desk adjusters under that class.
 2      Q.  And what do you mean by that?
 3      A.  What do I mean by what?
 4      Q.  You said the special class of employee.
 5      A.  So, we are taking tax withholdings, we are
 6  paying them overtime, but they're not accruing sick
 7  time, vacation, things like that, they're not a
 8  traditional employee.  They are accepting employment
 9  that is episodic for a specific event, and then when
10  that's done, they are stood down.
11      Q.  So you're taking tax withholding as if they
12  were employees?
13      A.  Yes.  As a special class of employee, yes.  So
14  they will receive a W-2 for the period that they were
15  deployed, if they're under that specific class of
16  employee.
17      Q.  So, no longer independent contractors?
18      A.  Can you restate?
19      Q.  So, they are no longer --
20      A.  No.  Some desk adjusters are independent
21  contractors, some are put under a special class of
22  employee.  Depends on the situation, depends on the
23  client.
24      Q.  What about for TD?
25      A.  We're putting them out as the special
```

Page 84

```
 1  designation employee.
 2      Q.  Meaning that you're withholding taxes.
 3      A.  Yes.
 4      Q.  And they would receive a W-2, as if they were
 5  an employee?
 6      A.  Yes.  Or a T-4, if they're Canadian.
 7      Q.  So it sounds like, with respect to the desk
 8  adjusters working for or deployed to TD, and I think
 9  this was your testimony earlier, based on this lawsuit,
10  maybe the changing landscape, as of July 2023, you've
11  made some changes to protect the company from future
12  liability, is that fair?
13      A.  It's fair except the date of July '23, and I
14  understand why you reference that with respect to TD,
15  but we started putting people out as a special class of
16  employee prior to that for other clients.
17      Q.  Okay.  And what other clients?
18      A.  Seibels, which is -- I think it's S-I-E --
19  forgive me if it's S-E-I -- but Seibels, which is a
20  third-party administrator in Columbia, South Carolina,
21  and Citizens.
22          MR. O'BRIEN:  Hey, when you get to a
23  stopping point, I think we could probably do lunch.
24          MR. GASPER:  One key final question.
25          MR. O'BRIEN:  Sure.  Go ahead.
```

**David John Repinski**

85

1  Q. (By Mr. Gasper) So, does CRU feel like it's
2  effectively cut off liability for the TD, Seibels and
3  Citizens, as of the date that you switched them over to
4  this special class of employees and are now paying
5  hourly?
6       MR. HURST: Objection, form.
7  A. Yeah. I'm not a lawyer. I don't know whether
8  I've successfully cut off liability.
9  Q. (By Mr. Gasper) Was that the intent?
10      MR. HURST: Objection, form.
11 A. The reason it was done for Seibels was because
12 their contract with us required that we could only
13 provide them with employers. They would not accept
14 contractors. So, it put us between a rock and a hard
15 place. The intent with Citizens was due to what was
16 foreseen to be an unprecedented event with respect to
17 Hurricane Ian.
18      Last year, when Ian was approaching the
19 coast, Citizens estimated 257,000 claims would be coming
20 their way. They said they didn't have enough adjusters,
21 they were very nervous about how that was going to work.
22 We were very concerned that an unprecedented level of
23 claims was going to put an enormous amount of pressure
24 on us and, therefore, on the contractors that we put
25 out.

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                          swreptproduction@swreporting.com

---

**David John Repinski**

86

1       Unprecedented would mean unprecedented. We
2  didn't know where we were going. We didn't know what
3  this was going to look like, so we put them out under
4  the special class of employee. Thankfully, Citizens'
5  estimate was wrong on that, but nonetheless, that Ian
6  team was deployed from the time that the storm made
7  landfall until July 12th of this year, so it was a
8  significant event.
9       MR. GASPER: Okay. I think we're at a good
10 stopping point for lunch.
11      (OFF THE RECORD FROM 11:55 TO 1:06 P.M.)
12      (MS. MORALES IS NOT PRESENT IN ROOM.)
13 Q. (By Mr. Gasper) So, we are back on the record.
14 Mr. Repinski, earlier, you testified there are fines and
15 penalties in CRU's contract with TD, correct?
16 A. Yes.
17 Q. Tell me about those fines and penalties.
18 A. They're at a high level for outcomes, usually
19 time based outcomes, closing a certain percentage of the
20 claims associated with an event within an allotted time.
21 Q. So, when would they kick in?
22 A. There's an agreement as to what day one is
23 once we deploy. What the first day of deployment is.
24 So TD would notify us, okay, the clock starts now.
25 Q. And is that -- what kind of -- what would that

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                          swreptproduction@swreporting.com

---

**David John Repinski**

87

1  agreement be referred to, like Service Level Agreement
2  or --
3  A. I'm sorry. I don't understand the question.
4  Q. What's the contract called between TD and CRU?
5  A. We have an MSA, Master Services Agreement, and
6  then we have an SOW, Statement of Work.
7  Q. And in the MSA and/or SOW, that would detail
8  the fines or penalties, is that right?
9  A. Yes. The terms, the financial terms between
10 CRU Group and TD Insurance would be outlined in those
11 documents.
12 Q. How would TD implement or communicate the fines
13 to CRU?
14 A. Following an event, when the event is truly put
15 to rest, they would come back and say, here are the
16 statistics that we show. But during the event, they
17 are -- they are very involved, they're very
18 communicative, so they would be coming to you saying,
19 here's how you're trending, here's what we're tracking.
20 I find them to be more involved than any other client.
21 Q. And from CRU's perspective, do you welcome
22 that, or is that a good thing or a bad thing?
23 A. They're my largest client, so I'm going to be
24 careful not to besmirch them, but, of course, I don't --
25 part of me doesn't welcome what can often be daily calls

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                          swreptproduction@swreporting.com

---

**David John Repinski**

88

1  with us and leadership, because we're there to do a job,
2  and every time we spend an hour on a call is an hour we
3  can't be servicing their policyholders at their moment
4  of need.
5       So I appreciate that they want to be close
6  to us and they want to keep us informed of what's going
7  on, but as a professional with pride, I'd like to be
8  able to do my damn job sometimes, right?
9  Q. Understood. How would -- how would the fines
10 or penalties play out, like would it show up on a credit
11 on an invoice, or how would that be reflected?
12 A. No. When it's all said and done, they would
13 tell us we owe them a check for X.
14 Q. So to avoid these fines or penalties, CRU has
15 to perform and complete claims work accurately and
16 within a certain timeframe, is that correct?
17 A. We have to comply with the SLAs, which are
18 generally time based, accuracy based, yes.
19 Q. And, otherwise, TD has a contractual right to
20 fine or penalize CRU financially.
21 A. To some extent.
22 Q. And would you agree, then, that CRU is
23 motivated to get the TD claims closed out accurately and
24 within a certain timeframe?
25 A. We are motivated to do that with any client.

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                          swreptproduction@swreporting.com

David John Repinski
89

1  Yeah.  Think about what we're dealing with, right?  You
2  have -- our client's policyholders have just had
3  something devastating happen to them; fire, flood,
4  whatever.
5          And that -- that promise of the policy, you
6  pay us premium, and if something happens to you, we'll
7  make you whole.  That promise of the policy is
8  outsourced to us.  It's not our money, but we're second
9  responders that come in and have the duty, the
10 obligation and the trust of making sure that they're
11 made whole.
12     Q.  Okay.  And CRU has to rely on its independent
13 desk adjusters to perform that work accurately and
14 within certain timeframes, correct?
15     A.  Those contract desk adjusters are part of the
16 service delivery, sure, certainly.
17     Q.  So if the independent desk adjusters do not
18 meet those standards, CRU can lose revenue from TD.
19     A.  Correct.
20     Q.  What methods does CRU use to make sure that the
21 independent desk adjusters meet those deadlines and
22 standards?
23     A.  We watch their productivity.  We watch their
24 productivity relative to one another.  We look at the
25 number of complaint escalations that we might be

David John Repinski
90

1  receiving on their claims.  We look at their reopen
2  rate.
3      Q.  How do you watch their productivity?
4      A.  Number of -- there's a few ways.  It depends,
5  right?  There's a few ways of doing it.  It can be
6  closures.  It can be, are they behind on their
7  individual SLAs?  Contacts.  Scheduling.  Claims
8  payments.  What is their performance rating from
9  previous deployment?  If they've been deployed
10 previously, they should have a performance rating from
11 us in the system.
12     Q.  And how are all those productivity metrics
13 tracked, like what kind of system do you use for -- to
14 track number of closures, contacts, scheduling?
15     A.  We provide a report -- we provide a suite of
16 reports to TD at their request.  So we have individuals,
17 analytics -- individuals associated with the team that
18 are monitoring our performance, and we're submitting
19 reports to TD, in terms of how we're doing.
20     Q.  And the individuals that are monitoring
21 performance, those are CRU employees, CRU workers, or
22 who is that?
23     A.  They can be employees.  They can be other
24 contractors who are skilled in the area of analytics
25 that are being used for purposes of that deployment.

David John Repinski
91

1      Q.  And what -- is there specific software, or what
2  method is used to track all that in a report?
3      A.  They would look at the claims management
4  system, like a Guidewire, and they would look at -- if
5  it's property claims, they would look at the underlying
6  property estimating system, like Xact or Symbility, as
7  we spoke of before.  If it's auto claims, there's a
8  suite of different auto platforms that they would look
9  at.
10     Q.  What are they looking at when they watch
11 productivity relative to one another?
12     A.  The same attributes that I just mentioned,
13 which I'm happy to reiterate.  It can be things like
14 escalated phone calls or complaints, number of reopened
15 claims, elapsed times to do certain things on files,
16 which can be contact, getting the inspection set,
17 getting the claim adjudicated once the information comes
18 back from the field.
19         It can be blown coverage, you know, if the
20 desk adjuster looks at coverage one way and somebody
21 within TD is looking at that and says, no, coverage did
22 not apply here, or you didn't apply this endorsement, or
23 you did and you shouldn't have.  So, it's objective.
24     Q.  Is that all of the methods that CRU uses to try
25 to get its independent adjusters to complete claims

David John Repinski
102

1  been times that they were paid by Catastrophe Response
2  Unit, Inc., which would be the Canadian business.
3      Q.  Okay.
4      A.  If they worked prior to that change in late '20
5  or '21.
6      Q.  Okay.  Let's look back at Exhibit 5.  This is
7  Defendant Catastrophe Response Unit USA's Second
8  Supplemental Objections and Responses, and I want to
9  look at the answer to Interrogatory No. 14, which is
10 on --
11     A.  Page --
12     Q.  Sorry.  Let's see.  The part that I want to
13 reference is on page 18, and it's the paragraph starting
14 with, "CRU USA denied Request No. 11 with respect to
15 named Plaintiffs and Opt-in Plaintiffs because the named
16 Plaintiffs and Opt-in Plaintiffs were sometimes paid a
17 lesser rate for working only a half day or partial day."
18 Did I read that correctly?
19     A.  Yes.
20     Q.  And do you know how that was tracked or
21 reported?
22     A.  I believe there are instances where when we
23 bill -- if somebody doesn't work a full day, we can't
24 charge that day to TD, we can only charge them half a
25 day, so, in turn, they're paid half a day.

**David John Repinski**

103

```
 1      Q.  And how would you know whether some of them
 2  worked a full day or half a day?
 3      A.  They would communicate that through their team
 4  lead.
 5      Q.  And how would they communicate that?
 6      A.  There's various ways that we talked about
 7  before.  I'm assuming it could be a phone call, it could
 8  be Teams, it could be an e-mail, it could be a text
 9  perhaps, I don't know.
10      Q.  Do you know if any of those ways of
11  communicating that, those documents have been produced
12  in discovery?
13      A.  I don't know.
14      Q.  Still with Exhibit 5, let's look at the
15  response to Interrogatory No. 6, which is on page --
16      A.  Page 8 is where it starts.
17      Q.  Thank you.  And I want to look specifically at
18  page 9, the response, Paragraph (1) there.  And I'll
19  just read it for the record.  It says, "The named
20  Plaintiffs and Opt-in Plaintiffs were responsible for
21  submitting to CRU USA what days they worked and how much
22  they worked on each day, so they could be compensated
23  according to their submissions.  The Named Plaintiffs
24  and Opt-in Plaintiffs were always provided with a record
25  of what they were paid and the work for which they were
```

**David John Repinski**

105

```
 1      A.  Yes.
 2      Q.  And, again, where are the records that would
 3  show days worked and how much worked on each day?
 4      A.  Where are the records?  So your question
 5  presumes that we have records that still reflect that.
 6  I don't know that we still have those records.  The
 7  contractor would have communicated to their team lead
 8  that they were only working a half day or they weren't
 9  working.  That would be translated to what we billed TD
10  for that person for that day.
11          That contractor would have received a
12  remuneration statement showing what they are paid for.
13  If they had a disagreement with that, they could voice
14  that.  But I'm not aware of any records that have been
15  kept long term on this.
16      Q.  Okay.  And what is the term -- the retention
17  policy for records like that?  How long do you keep it?
18      A.  When you say, "records like that" --
19      Q.  Like the deposit reconciliation.
20      A.  I don't know what the deposit reconciliation
21  duration is, but it would be measured in years.
22      Q.  And did you, as part of the discovery process,
23  look for those documents?
24      A.  I believe we looked and provided some -- we
25  provided the deposit information, I believe.
```

**David John Repinski**

107

```
 1  hours, and that's what we talked about earlier this
 2  morning, where it was passed down to the contractors, as
 3  far as working additional time and, you know,
 4  supplemental hours, supplemental pay.
 5      Q.  What are the factual bases for CRU's claim that
 6  they were not Plaintiffs' employers?
 7          MR. HURST:  Objection, form.
 8      A.  They weren't employees.
 9      Q.  (By Mr. Gasper)  And what facts can you point
10  to for those claims?
11          MR. HURST:  Same objection.
12      A.  They signed up on our independent contractor
13  roster.  They signed an agreement as an independent
14  contractor.  They were free to leave, if they wanted to
15  leave.  They had -- they had the portability, the
16  mobility of an independent contractor.
17          They can sign up for certain deployments.
18  They can -- I'll work for this client, not for that
19  client.  I'll do this, I won't do that.  They can
20  negotiate.  Not that -- they don't always prevail, but
21  they can push back on their pay, they can negotiate
22  their pay.
23      Q.  (By Mr. Gasper)  Anything else?
24      A.  Nothing that comes to mind.
25      Q.  What documents support CRU's decision to
```

**David John Repinski**

108

```
 1  classify Plaintiffs as independent contractors?
 2          MR. HURST:  Objection, form.
 3      A.  The contract.  The independent adjuster
 4  contract.
 5      Q.  (By Mr. Gasper)  Do you know if there's been,
 6  during the relevant time period, any revisions to the
 7  Independent Contractor Agreement for desk adjusters?
 8      A.  For all adjusters.
 9      Q.  For all adjusters.
10      A.  Yes.  As we spoke about this morning, that was
11  implemented right around June 1 of 2020.
12      Q.  And just to refresh my memory, what was the
13  change there?
14      A.  Sure.  That's when it changed from being a
15  Canadian contract to separate contracts for Canada and
16  U.S.  So, if you're a Canadian, you come under a
17  Canadian independent adjusting agreement, regardless of
18  what country you're working in.  If you're an American,
19  you come under the U.S. contract, regardless of what
20  country you're working in.  That contract looks the same
21  if you're a field adjuster or desk adjuster.
22      Q.  And were there any other changes to the
23  contract?
24      A.  I don't understand the question, because the
25  contract was completely changed, so when you say, "any
```

David John Repinski

109

other changes," what does that mean?
Q. What other changes, other than the changes, if you were working in the U.S., you were -- there was a Canadian contract and a U.S. contract. What else --
A. We implemented a completely new U.S. contract on or about June 1 of 2020.
Q. And I'm just asking, what else was changed or different from the previous contract to the new contract?
A. Right. Apologies, I'm struggling to answer that because the whole contract was changed. So if you're asking me specifically what elements were changed in the contract, I don't know off the top of my head which elements were changed, but some of the requirements -- some requirements were added and some were changed.
Q. Okay. How was claims activity documented by desk adjusters?
A. Are you talking specific to these nine individuals on TD?
Q. Just generally.
A. As we talked about this morning, it's documented by whatever means that -- it depends, right? Whatever means our client on that team tells us to do, it's usually documenting their claims management system.

David John Repinski

110

Q. Okay. That's the CMS.
A. Yes, sir.
Q. And was there also like an Excel spreadsheet, tracker that was monitored by team leads and managers?
A. For what purpose?
Q. For each claim, to monitor the tasks included for each claim?
A. I don't know. We were providing reports, as I mentioned, back to TD, in terms of the overall portfolio performance. Those were often Excel spreadsheets, so it stands to reason that we had to get data from below in an Excel spreadsheet to feed the big spreadsheet that we were sending to the client, so that is highly probable.
Q. We've talked about team leads and managers who supervised or managed Plaintiffs. Who employed the team leads and managers?
A. CRU either employed or deployed, because most of them were contractors.
Q. Is there an independent contractor handbook or something similar that has additional policies applicable to desk adjusters?
A. There's no handbook.
Q. Okay. Are there other policies or requirements applicable to desk adjusters that we haven't talked about?

David John Repinski

112

ultimately that would sit with Adam Dickens. It would depend on what level of authority stood -- within his team, a team lead may come forward and say, hey, we've gotten slow, I'd like to stand down these two adjusters. They're my worst performers or they're my slowest or they've been out the longest and need some down time. But, ultimately, it would be agreed to by Adam, because it may require the client to understand that, hey, we're standing a couple down.
Q. Who managed and controlled Plaintiffs' work schedules? Who managed and controlled Plaintiffs' work schedules?
A. The use of the word "control" is what's tripping me up in that. The general work schedule was based on expectations set forth by TD and the outcomes that were necessary to reach our SLAs by the end of the cap. The team leads would help manage that adjuster and manage the schedule. The word -- I can't object, but if I could, I'd object to the word "control."
Q. How would you describe it?
A. Manage.
Q. Okay. Fair enough.
A. Supervise. I mean, you know, communicate. It's really about communicating. That adjuster could say, I'm not working tomorrow. And it's less about

David John Repinski

118

are employed by CRU or work for CRU either as employees or contractors, is that right?
A. Yes.
Q. Are any of those team leads or managers, do they work for TD?
A. No. We wouldn't -- if they were a TD -- are you asking if they're a TD employee?
Q. Yes.
A. No, we wouldn't refer to them as a -- we would refer to them as they're with the client. They're our client manager or they're with the client. They are the client's catastrophe manager or something like that.
Q. Okay.
A. We would talk about them differently, or we should.
Q. Different terminology?
A. Yeah.
Q. Approximately, how much of CRU's business comes from TD?
A. That varies.
Q. During the relevant time period, can you give me an estimate?
A. Appreciating that the relevant time period has been catastrophe prone in Canada, it's been 50 percent.
Q. And what about in the U.S.?

**David John Repinski**

119

```
 1      A.  I don't understand the question.
 2      Q.  Is TD's business all in Canada?
 3      A.  TD is not a property and casualty insurer in
 4  the United States, so any work that we do for TD -- any
 5  work we do for TD is on Canadian policies, Canadian
 6  claims.
 7      Q.  Okay.  And so you estimate about 50 percent?
 8      A.  Just to clarify my answer, during the period,
 9  about 50 percent of our total CRU Group, which is Canada
10  and U.S. revenue, roughly 50 percent comes from TD,
11  because the last few years have been very catastrophe
12  intensive in Canada.
13      Q.  And can you estimate the number of independent
14  desk adjusters who have deployed for TD since
15  December 2019?
16      A.  No.  We did talk about this this morning, and I
17  mentioned I struggle because many of them have deployed
18  for multiple deployments, multiple times, so I don't
19  know the number.  I don't know if it's the same adjuster
20  deploying four times or four adjusters deploying once.
21      Q.  Are you able to give any kind of estimate, like
22  more than 100?  More than 200?
23      A.  I don't know, so I don't want to hazard a
24  guess.
25      Q.  Okay.  And, again, what would we look at, if we
```

**David John Repinski**

123

```
 1  contract, no where in my contract does it state that I
 2  cannot work another job."  And it continues on that
 3  second page.  Do you know why Olandria Quinnie was
 4  asking for the hours for the new job?
 5      A.  Would you like my speculation?
 6      Q.  Yes.
 7      A.  It is -- well, let me say a few things, then we
 8  can go back and clean it up, to the extent that you'd
 9  like to.  There are things that Ms. Quinnie said that I
10  would have stated differently.  Ms. Quinnie, being a
11  contractor who herself I don't think understood some of
12  the terms.  Ms. Mays was free to go.  I don't recall
13  from the contract that anything has to be given in
14  writing.  She is free to leave.  There is a potential
15  claw back in terms of dollars.
16          The -- it is -- it is -- there's nothing in
17  the contract that precludes you from doing contract work
18  for somebody else at the same time.  There is a
19  practical issue of, if you're working -- if you're
20  deployed for us, it's going to be really, really hard
21  for you to be deployed for somebody else at the same
22  time.
23          So, we would like -- we would like to be
24  your sole supplier, in terms of work during the
25  deployment period, but you are free to go.  So, could
```

**David John Repinski**

125

```
 1  marked as Plaintiff's Exhibit No. 9.  This is
 2  Catastrophe Response Unit USA, Inc.s Independent
 3  Contractor Agreement, Bates numbered CRU 92 to 101.
 4  Give you a chance to flip through that.  Let me know
 5  when you're ready.  I just have a couple of specific
 6  questions.
 7      A.  I think you can go.  I may ask you to pause,
 8  but --
 9      Q.  No problem.  If you'd turn to CRU 94.
10      A.  Yes.
11      Q.  At the bottom of that paragraph on Independent
12  Contractor, it states, "Further, contractor -- and
13  skipping down to Subsection ii -- shall have the right
14  to perform services for others, shall -- I think it
15  should say -- have the right to set Contractor's work
16  schedule; and notwithstanding the performance standards
17  and timelines Contractor shall be required to meet,
18  shall have the right to control the means, method and
19  manner by which the services are performed under this
20  Agreement."  Did I read that correctly?
21      A.  Yes.
22      Q.  Do you agree with Subsection iii there, that
23  the Contractor shall have the right to set contractor's
24  work schedule?
25      A.  To the extent it's allowable by that client
```

**David John Repinski**

126

```
 1  under that circumstance, yes.  And in most cases, they
 2  have exactly that ability to work independently and to
 3  set their schedule.  It's a little more constrained
 4  under a TD deployment, but yes, I do.
 5      Q.  But that doesn't say that here, right?
 6      A.  Of course not.
 7      Q.  Which individual -- which individuals at CRU
 8  have the responsibility for ensuring CRU's compliance
 9  with the FLSA relating to the payment of overtime wages
10  for -- let me back up.
11          Let's talk about CRU's recordkeeping
12  practices.  When this lawsuit began, are you aware of
13  any kind of litigation hold being issued?
14      A.  Yes.  I passed the word to relevant parties
15  that we needed to have a litigation hold.  That would be
16  standard practice.
17      Q.  Could a desk adjuster decide not to work on a
18  claim assigned to them by CRU?
19      A.  Conceivably, they could.
20      Q.  And would there be any kind of consequence for
21  that?
22      A.  I think that maybe depends on the circumstance.
23  It could be a conflict of interest, where they know the
24  insured or a party who's involved in the claim, and that
25  would be a very good reason for refusing to work on it.
```

David John Repinski

```
                                                              134
 1            IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TEXAS
 2                     SHERMAN DIVISION

 3   C.M. COLLINS, N.J. LUNDY,    )
     and R.C.L. MAYS,             )
 4   individually and on behalf   )
     of all others similarly      )
 5   situated,                    )
                                  )
 6            Plaintiffs,         ) CIVIL NO.
                                  )
 7   v.                           ) 4:22-CV-1073-SDJ
                                  )
 8   CATASTROPHE RESPONSE UNIT,   )
     INC. and CATASTROPHE         )
 9   RESPONSE UNIT USA, INC.,     )
                                  )
10            Defendants.         )
                                  )
11
12          ----------------------------------
13                DEPOSITION CERTIFICATE
14                 DAVID JOHN REPINSKI
15                  AUGUST 28, 2023
16          ----------------------------------
17
18          I, Nita G. Cullen, Certified Shorthand
19   Reporter in and for the State of Texas, hereby certify
20   to the following:
21          That the witness, DAVID JOHN REPINSKI, was
22   duly sworn by the officer and that the transcript of the
23   oral deposition is a true record of the testimony given
24   by the witness;
25          I further certify that pursuant to FRCP
```

Southwest Reporting & Video Services, Inc.    Registration #189
713-650-1800                         swreptproduction@swreporting.com

David John Repinski

135

1  Rule 30(f)(1) that the signature of the deponent:

2              _x_ was requested by the deponent or a

3  party before the completion of the deposition and is to

4  be returned within 30 days from date of receipt of the

5  transcript.  If returned, the attached Changes and

6  Signature Page contains any changes and the reasons

7  therefor;

8              ___ was not requested by the deponent or a

9  party before the completion of the deposition.

10             I further certify that I am neither

11 attorney or counsel for, nor related to or employed by,

12 any of the parties or attorneys to the action in which

13 this deposition was taken.  Further, I am not a relative

14 or employee of any attorney of record in this case, nor

15 am I financially interested in the outcome of the

16 action.

17             Subscribed and sworn to on this 18th day of

18 September, 2023.

19

20

21 _____
   NITA G. CULLEN, Texas CSR #1563
22 Expiration Date:  08-31-2024
   Firm Registration No. 189
23 SOUTHWEST LITIGATION SERVICE
   826 Heights Boulevard
24 Houston, Texas  77007
   713.650.1800

25