Adam Dickens

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE EASTERN DISTRICT OF TEXAS
 3                       SHERMAN DIVISION
 4  C.M. COLLINS, N.J. LUNDY,    §
    and R.C.L. MAYS,             §
 5  Individually and on behalf   §
    of all other similarly       §
 6  situated,                    §
                                 §
 7                               §
         Plaintiffs,             §
 8                               §
    VS.                          §        NO. 4:22-cv-1073
 9                               §
    CATASTROPHE RESPONSE UNIT,   §
10  INC. and CATASTROPHE         §
    RESPONSE UNIT USA, INC.,     §
11                               §
         Defendants.             §
12
13                    ORAL DEPOSITION OF
14                       ADAM DICKENS
15                     NOVEMBER 1, 2023
16                         VOLUME 1
17
18
19
20
21
22
23
24
25
```

Southwest Reporting & Video Services, Inc.    Registration #189
713-650-1800                                swreptproduction@swreporting.com

**Adam Dickens**

2

1  ORAL DEPOSITION of ADAM DICKENS,
2  produced as a witness at the instance of the
3  Plaintiffs, and duly sworn, was taken in the
4  above-styled and numbered cause on the 1st of
5  November, 2023, from 9:58 a.m. to 1:54 p.m., before
6  Kathy E. Weldon, CSR in and for the State of Texas,
7  reported by machine shorthand, at the offices of
8  Hallett & Perrin, 1445 Ross Avenue, Suite 2400, in the
9  City of Dallas, County of Dallas, State of Texas,
10 pursuant to Notice and the Federal Rules of Civil
11 Procedure.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Adam Dickens

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE EASTERN DISTRICT OF TEXAS
 3                       SHERMAN DIVISION
 4   C.M. COLLINS, N.J. LUNDY,    §
     and R.C.L. MAYS,             §
 5   Individually and on behalf   §
     of all other similarly       §
 6   situated,                    §
                                  §
 7                                §
          Plaintiffs,             §
 8                                §
     VS.                          §   NO. 4:22-cv-1073
 9                                §
     CATASTROPHE RESPONSE UNIT,   §
10   INC. and CATASTROPHE         §
     RESPONSE UNIT USA, INC.,     §
11                                §
          Defendants.             §
12
13                     ORAL DEPOSITION OF
14                       ADAM DICKENS
15                     NOVEMBER 1, 2023
16                         VOLUME 1
```

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                           swreptproduction@swreporting.com

Adam Dickens                                                    2

```
 1          ORAL DEPOSITION of ADAM DICKENS,
 2   produced as a witness at the instance of the
 3   Plaintiffs, and duly sworn, was taken in the
 4   above-styled and numbered cause on the 1st of
 5   November, 2023, from 9:58 a.m. to 1:54 p.m., before
 6   Kathy E. Weldon, CSR in and for the State of Texas,
 7   reported by machine shorthand, at the offices of
 8   Hallett & Perrin, 1445 Ross Avenue, Suite 2400, in the
 9   City of Dallas, County of Dallas, State of Texas,
10   pursuant to Notice and the Federal Rules of Civil
11   Procedure.
```

Adam Dickens                                                    44

```
 1       A.  So desk adjusters, we face a penalty for not
 2   providing -- I'm just trying to think of the best way
 3   to phrase it for you -- not fulfilling the client's
 4   ask within certain timelines.
 5       Q.  Okay.  And the client being TD?
 6       A.  Correct.
 7       Q.  Is there a particular person at TD that's
 8   designated as the person that identifies what a
 9   particular deadline's going to be?
10       A.  No.  It's in the contract.
11       Q.  Okay.  So these deadlines for the desk
12   adjuster work are specifically within the contract?
13       A.  Correct.
14       Q.  Okay.  And are those -- are those dead- --
15   those deadlines based on closing a percentage of
16   claims within a certain period of time as well?
17       A.  No.
18       Q.  Okay.  How is it -- how is that defined
19   within the contract?
20       A.  So you -- sorry, you're thinking at it from
21   the wrong angle.  So it's the field one is a back-end
22   closed.  The desk one is actually front-end adjusters
23   in the door.  So in the contract, we have timelines to
24   provide adjusters to TD.
25       Q.  Okay.  So the timeline, there are specific
```

Adam Dickens                                                    49

```
 1       A.  The -- the more overdue activities there are
 2   on adjusters' files, then there's the potential for a
 3   reduction.
 4       Q.  Okay.  How much -- how -- how much of a
 5   maximum reduction can occur on an overdue file?
 6   What's the maximum reduction amount?
 7       A.  It's not a file amount.
 8       Q.  Okay.
 9       A.  It's a -- it's a billing percentage for the
10   indvi- -- for the individual.  And, Kerry, I don't
11   remember the amount off the top of my head.
12       Q.  That's fine.
13       A.  Yeah.
14       Q.  Okay.  So it's my understanding, then, that
15   if the desk adjusters don't complete certain
16   activities on their files, it can result in CRU being
17   paid less money for that work?
18       A.  Correct.
19           MS. LASTER:  Kerry, when you get a
20   moment, can we do a --
21           MR. O'BRIEN:  Break?  That's fine.
22           MS. LASTER:  Thank you.
23           MR. O'BRIEN:  Go off the record.
24           (Break from 10:54 a.m. to 11:11 a.m.)
25       Q.  (By Mr. O'Brien) Mr. Dickens, are you
```

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                           swreptproduction@swreporting.com

## Page 53

Adam Dickens

1  contract.
2     Q.  And what's "it"?
3     A.  I would have to read the contract.  I don't
4  know off the top of my head.
5     Q.  You said "stay" -- "if it stayed below the
6  percentage."
7     A.  The number of overdue activities.
8     Q.  Got it.  So there's a threshold that -- that
9  has to be crossed before the penalty applies?
10    A.  Correct.
11    Q.  Okay.  Now, on the TD account, is it your
12 understanding that TD -- TD uses an application called
13 Guidewire for their claims tracking?
14    A.  Yes.
15    Q.  Has that been the case since you've come on
16 board?  Has Guidewire been the -- their application
17 of -- of choice since you came on board?
18    A.  Yes.
19    Q.  Do you know who -- who licenses that software
20 for this use, is it CRU or TD?
21    A.  TD.
22    Q.  What -- what application -- first of all, let
23 me ask you:  When did you manage the BAU claims on the
24 Gore account?
25    A.  Sorry?

## Page 55

Adam Dickens

1     Q.  Are any desk adjusters -- and I'm
2  asking -- you know, obviously, I've -- I guess I'm
3  asking as of this moment, but --
4     A.  Yeah.
5     Q.  -- I can always change that.
6         But currently, are any desk adjusters
7  assigned to the TD account permitted to use their
8  personal laptops to perform their adjusting work for
9  TD?
10    A.  No.
11    Q.  And why not?
12    A.  That's the request of the client.
13    Q.  So each desk adjuster that is assigned to the
14 TD account is provided a laptop, correct?
15    A.  Correct.
16    Q.  Who prepares that laptop?
17    A.  TD.
18    Q.  So is -- is CRU just a conduit for that --
19 for that laptop?
20        MS. LASTER:  Objection, form.
21    Q.  (By Mr. O'Brien) Let me ask you this:  Does
22 CRU make any modifications to that laptop before
23 sending it to the desk adjuster?
24    A.  CRU doesn't touch that laptop.
25    Q.  Okay.  So it's -- so the laptop goes directly

## Page 61

Adam Dickens

1     Q.  Possibly all of them, correct?
2         MS. LASTER:  Objection, form.
3     A.  No.
4     Q.  (By Mr. O'Brien) Okay.  So some are working
5  from a home office, some may be -- you said possibly.
6  You don't know for certain, but some may actually rent
7  an office that they may go to, correct?
8     A.  Correct.
9     Q.  What other locations are current TD desk
10 adjusters working from, to your knowledge?
11    A.  To my knowledge, none.
12    Q.  To your knowledge -- oh, none others -- no
13 other settings, no other -- okay.
14        And so there's no -- there's no rented
15 office -- an office rented by CRU to -- or TD, to your
16 knowledge, to which some of the desk adjusters have to
17 report on a daily basis?
18        MS. LASTER:  Objection, form.
19    A.  Sorry, Kerry, can you repeat that, please?
20    Q.  (By Mr. O'Brien) Sure.
21        Do any -- do any of the adjusters -- any
22 of the desk adjusters on the TD account have to report
23 to an office that's paid for or sponsored by CRU or
24 TD, to your knowledge?
25    A.  No.

## Page 65

Adam Dickens

1     Q.  Well, within BAU are -- well, let me ask you
2  this:  Within BAU, are the adjusters typically
3  handling a subset of a certain type of claims within
4  BAU, or are they assigned to whatever claim comes in?
5     A.  They would handle either property or -- if
6  they're auto adjusters, they would handle auto.
7     Q.  Okay.  So within BAU, they're still going to
8  be assigned to one type of claim or another; is that
9  correct?
10    A.  Correct.
11    Q.  So between BAU, auto, and cat auto, is there
12 typically a difference in average volume?
13    A.  I don't know.
14    Q.  Let me talk about on-boarding of -- of desk
15 adjusters to the TD account.  Is there any training
16 that takes place for that?
17    A.  Yes.
18    Q.  Okay.  Can you tell me -- have you
19 actually -- is -- let me stop for a second.
20        Is the training done -- it's done by --
21 over the Internet, correct?
22    A.  Correct.
23    Q.  Is it typically live training?  Is it all
24 live training, or is it all prerecorded or otherwise?
25    A.  A -- the vast majority is live versus

Adam Dickens

73

1  just mentioned about, sort of a change in compensation
2  methods.
3              So are all current desk adjusters at CRU
4  that are on the TD account -- are they being paid on a
5  W-2 basis at this time?
6       A.   No.
7            MS. LASTER:  Objection, form.
8       Q.   (By Mr. O'Brien) Some of them are; is that
9  correct?
10      A.   Yes.
11           MS. LASTER:  Objection.
12      Q.   (By Mr. O'Brien) Okay.  So what criteria is
13 used to determine whether or not a particular desk
14 adjuster is going to be paid on a 1099 or a W-2 basis?
15           MS. LASTER:  Objection, form.
16      A.   There's none paid on 1099.
17      Q.   (By Mr. O'Brien) Okay.  So -- okay.  So the
18 current desk adjusters on the TD account, are they --
19 and I think I just asked this.  I want to be clear --
20 are they all being currently -- currently being paid
21 on W-2 basis?
22           MS. LASTER:  Objection to form.
23      A.   No.
24      Q.   (By Mr. O'Brien) Okay.  So if they're not
25 being -- the ones who are not being paid on a W-2

Adam Dickens

74

1  basis, how are they being paid?
2       A.   They're being paid as contractors.
3       Q.   Okay.  So some of them are being paid as a
4  contractor still, correct?
5       A.   Correct.
6       Q.   Okay.  And that's when I -- when I say 10- --
7  I'm -- that's probably the issue.
8            Do you know what a 1099 is?
9       A.   Yes.
10      Q.   Okay.  So do you -- do you equate contractor
11 with 1099?  Do those mean the same thing to you?
12           MS. LASTER:  Objection, form.
13      A.   Yes.
14      Q.   (By Mr. O'Brien) Okay.  Because I think I
15 just asked you a moment ago whether any are still
16 being paid on a 1099 basis, and you said --
17      A.   No.
18      Q.   Okay.  So -- so are there desk adjusters
19 being paid as independent contractors currently on the
20 TD account?
21      A.   Yes.
22      Q.   Okay.  And will they be -- will CRU be
23 issuing them a form 1099 at the end of the year?
24      A.   No.
25      Q.   Okay.  So is it because they're -- because

Adam Dickens

75

1  they work in Canada?
2       A.   Correct.
3       Q.   Thank you.  Got it.
4            So can you please tell me about the --
5  the compensation structure of the desk adjusters
6  working on the W-2 basis now?
7            MS. LASTER:  Objection, form.
8       A.   They're paid on an hourly basis.
9       Q.   (By Mr. O'Brien) Okay.  So they're paid a
10 certain hourly rate for each hour that they work,
11 correct?
12      A.   Correct.
13      Q.   And if they go over 40 hours in a workweek,
14 are they paid an overtime premium?
15      A.   Correct.
16      Q.   And I assume that all these W-2 desk
17 adjusters are ones who are performing their work from
18 the United States?
19      A.   Correct.
20      Q.   Is there any other incentive compensation --
21 is there any incentive compensation component as part
22 of this W-2 structure?
23      A.   Not that I'm aware of.
24      Q.   So their pay structure, basically just --
25 it's a straight hourly rate unless they go over 40

Adam Dickens

87

1       A.   No.
2       Q.   What was your understanding of the purpose of
3  that tracker spreadsheet?
4       A.   To track the activity by the adjusters on the
5  files to provide information to the client.
6       Q.   Okay.  Is it your understanding that while
7  they were using this tracker spreadsheet, that they
8  would have been inputting claims information into
9  Guidewire as well?
10      A.   Yes.
11      Q.   Okay.  And do you -- is it your understanding
12 that some of the information that they put on the
13 tracker spreadsheet duplicated the information that
14 they had already put into Guidewire -- Guidewire on
15 particular claims' activity?
16      A.   No.
17      Q.   So none of it was duplicated?
18      A.   Yeah, I don't think your question captures
19 it.  I'm not being rude.
20      Q.   You're Canadian.  Of course, you're not.
21      A.   The -- it was just what the singular action
22 was on the -- on the spreadsheet, a check in a check
23 box.
24      Q.   And what information was being given to TD
25 from the tracker spreadsheet?

**Adam Dickens**

Page 90

```
 1  during a week, correct?
 2          MS. LASTER:  Objection, form.
 3      A.  Correct.
 4      Q.  (By Mr. O'Brien) Okay.  And if CRU adjusters
 5  did not meet those requirements, could that implicate
 6  potential penalties against CRU under the TD contract?
 7      A.  Potentially.
 8      Q.  Okay.  And so are you aware of the managers
 9  or leads doing anything to try to encourage, motivate,
10  or otherwise discipline the desk adjusters to -- let
11  me strike that.
12          Are you aware of any- -- anything that
13  the team leads or the managers did to try to get the
14  desk adjusters to meet the client's requirements in
15  that respect?
16      A.  Yes.
17      Q.  What?
18      A.  There would be coaching about setting your
19  activities and not overloading one day of your week
20  versus another day of your week so that it wouldn't
21  all pile down on one -- on one week.
22      Q.  Okay.  Anything else?
23      A.  No.
24      Q.  Okay.  Were the desk adjusters required to
25  touch a certain number of claims in each week?
```

**Adam Dickens**

Page 91

```
 1          MS. LASTER:  Objection, form.
 2      A.  Expected to.
 3      Q.  (By Mr. O'Brien) Expected to?
 4          And if a particular desk adjuster
 5  consistently failed to meet those expectations, that
 6  desk adjuster could be released by CRU, correct?
 7      A.  Correct.
 8      Q.  And -- and I'm not sure if this was clear
 9  from the last -- from my prior question on this.  Were
10  you aware of the mana- -- have you been aware of the
11  managers and team leads requiring that each desk
12  adjuster conduct a certain amount of claim activities
13  on each particular workday?
14      A.  No.
15      Q.  So what you understand or what you're aware
16  of is requirements based on a weekly basis, correct?
17      A.  Correct.
18      Q.  Would the managers or desk adjusters have had
19  the authority to require -- wait a second.  Strike
20  that.
21          Would the managers of the team leads have
22  had the authority to require the desk adjusters to
23  perform a certain quantity of claims activity every
24  day as part of their management of those adjusters?
25          MS. LASTER:  Objection, form.
```

**Adam Dickens**

Page 92

```
 1      A.  So repeat that, please.
 2      Q.  (By Mr. O'Brien) Sure.
 3          Did the -- did the -- did the team leads
 4  or the manager have the authority to require the desk
 5  adjusters that they managed to perform a certain
 6  amount of claims activity per day?
 7          MS. LASTER:  Objection, form.
 8      A.  Yes.
 9      Q.  (By Mr. O'Brien) But you don't know whether
10  or not they've -- they've done that in the past, I
11  guess, since you've come on board?  You don't know
12  whether or not that's actually occurred with managers
13  of team leads since you've come on board on the TD
14  account, correct?
15      A.  There's still the expectation of the client.
16      Q.  Sure.
17          But what -- is there an expectation of
18  the client as far as daily progress or daily activity
19  of their desk adjusters?
20      A.  No.
21      Q.  You had mentioned one of the penalty
22  provisions had to do with field adjusters, I believe,
23  bringing claims to close within 28 days.  Was that
24  correct?
25      A.  Not really.
```

**Adam Dickens**

Page 94

```
 1      A.  No.
 2      Q.  They're not saved, or you don't know?
 3      A.  I don't know.  That was your question.
 4      Q.  Okay.  Fair enough.  Yeah, absolutely.
 5          Do you know who had access to the tracker
 6  spreadsheets that you referenced earlier?
 7          MS. LASTER:  Objection, form.
 8      A.  Adjusters, team leads, and the managers.
 9      Q.  (By Mr. O'Brien) Is it your understanding
10  that the -- that all of the adjusters on the team
11  would use the same tracker spreadsheet?
12      A.  Yes.
13      Q.  So basically, the data input by each adjuster
14  on the team would be seen -- could be seen by all the
15  other adjusters on the team?
16      A.  Yes.
17      Q.  Does TD -- under the contract -- the current
18  contract with TD, do they have any requirements as far
19  as when they need adjusters to be available to field
20  communications from their insured?
21      A.  No.
22      Q.  Do they -- so do they have any coverage
23  requirements as far as -- I guess to phrase it
24  differently, does TD require adjusters to be available
25  or performing work during any particular part of the
```

**Adam Dickens**
95

1  day?
2      A.  Yes.
3      Q.  And what is that?
4      A.  The workday.
5      Q.  Okay.  And when you say "the workday," what
6  do you mean?
7      A.  Generally, it's 8:00 to 5:00, 6:00 local
8  time.
9      Q.  I'm sure that time may differ depending on
10 what -- in what time zone the adjuster's located,
11 correct?
12     A.  No.
13     Q.  No?
14         Okay.  So typically, they're going to be
15 from 8:00 a.m. to 5:00 or 6:00 in whatever time zone
16 they're in?
17     A.  No.
18     Q.  Okay.  So what -- so that's your -- but you
19 describe that as the workday, correct?
20     A.  Correct.
21     Q.  Okay.  And that -- would that be Monday
22 through Saturday?
23     A.  Yes.
24     Q.  So as part of being on the TD account, a desk
25 adjuster is going to have to keep hours similar to

**Adam Dickens**
96

1  this in order to meet TD's expectations, correct?
2      A.  Correct.
3      Q.  Are there any desk adjusters on the TD
4  account that you're aware of that do not -- are not
5  required to keep any specific hours?
6      A.  Not that I'm aware of.
7      Q.  So if an -- a desk adjuster -- if -- if a
8  desk adjuster is not keeping up with the deadlines
9  expected of TD, CRU can release that adjuster,
10 correct?
11     A.  Correct.
12     Q.  And now that adjusters are being paid on a
13 W-2 basis, is it fair to say that CRU can fire the
14 adjuster?
15     A.  Yeah.  They would still be released, yeah.
16     Q.  Okay.  But would -- is -- is it inaccurate to
17 say that they're being fired?
18     A.  Well, it's the end of their employ- --
19 employment.
20     Q.  Okay.  So is it inaccurate from me to say
21 that they are being fired?
22     A.  If you need to use that word, you can.
23     Q.  But it's not.  I mean, they are being --
24 they're losing -- they're being terminated from a
25 position --

**Adam Dickens**
102

1      Q.  Anything else?
2      A.  No.
3      Q.  Would you have those types of meetings
4  initially when they're on-boarding as part of training
5  them up to TD's expectations?
6      A.  You know, we talked about that earlier, that
7  we'd talk about what the expectations are, same type
8  of thing.
9      Q.  Okay.  And any other reason you would have
10 these types of group meetings other than what you've
11 mentioned so far?
12     A.  Essentially, talk about -- yeah, yeah.
13     Q.  What reasons?
14     A.  Potentially talk about the -- how the
15 deployment was doing.
16     Q.  Anything else?
17     A.  No.
18     Q.  Now, prior to CRU paying desk adjusters --
19 well, first of all, let me ask you:  Is it your
20 understanding that all desk adjusters working in the
21 United States --
22         (Interruption.)
23         MR. O'BRIEN:  For a second there, I was
24 hoping she'd take over the deposition for me.
25     Q.  (By Mr. O'Brien) Okay.  Prior to CRU paying

**Adam Dickens**
103

1  desk adjusters in the United States on a W-2 employee
2  basis, was it your understanding that the -- those
3  same adjust- -- those same adjusters were being paid
4  on a 1099 contractor basis?
5      A.  Yes.
6      Q.  And is it your understanding they were all
7  being paid on a day-rate basis?
8      A.  On the TD account?
9      Q.  Only -- that's a good question.
10         Yes, on the TD account.
11     A.  Yes.
12     Q.  Okay.  Actually, this was the question I was
13 going to ask before.  Are you aware of whether or not
14 all desk adjusters employed by CRU, regardless of the
15 contract, that work in the United States are currently
16 being paid on a W-2 basis?
17     A.  I don't have any knowledge of that.
18     Q.  And so going back to when they're desk
19 adjusters, say, on the TD account were being paid on a
20 1099 basis, they're paid on a day rate, correct?
21     A.  Correct.
22     Q.  And a day rate being a set amount of money
23 regardless of the time work -- work spent -- time
24 spent working that day, correct?
25         MS. LASTER:  Objection, form.

**Adam Dickens**
105

```
 1    Q.  So once they miss four and a half hours,
 2  they've missed half of a workday?
 3    A.  Yeah.  It's not written in stone, but yes.
 4    Q.  Who makes the decision as to whether or not a
 5  particular adjuster has worked only half of a workday?
 6    A.  That would be the managers.
 7    Q.  You said it's not written in stone, meaning
 8  that the manager can use their discretion as to
 9  whether or not they think that the adjuster has only
10  worked half a day?
11    A.  No.  Because that's reported by the adjuster.
12    Q.  Oh, that they worked half a day?
13    A.  Yeah.
14        MR. HURST:  That was totally my fault.  I
15  hit the wrong button.
16    Q.  (By Mr. O'Brien) Do you have any knowledge as
17  to why CRU is paying desk adjuster on a W-2 basis now?
18    A.  Yes.
19    Q.  What is that knowledge?
20    A.  This lawsuit.
21    Q.  Have you spoken to Faye Quinnie at any time
22  in the last month?
23    A.  Yes.
24    Q.  Okay.  Have you spoken to her for any reason
25  related to this lawsuit?
```

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                      swreptproduction@swreporting.com

**Adam Dickens**
134

```
 1  STATE  OF  TEXAS  )
 2  COUNTY OF DALLAS  )
 3        I, Kathy E. Weldon, Certified Shorthand
 4  Reporter, in and for the State of Texas, certify that
 5  the foregoing deposition of ADAM DICKENS was reported
 6  stenographically by me at the time and place
 7  indicated, said witness having been placed under oath
 8  by me, and that the deposition is a true record of the
 9  testimony given by the witness.
10        I further certify that I am neither counsel
11  for nor related to any party in this cause and am not
12  financially interested in its outcome.
13        Given under my hand on this the ____ day of
14  _____, 2023.

15                    _____
16                    Kathy E. Weldon
17                    Shorthand Reporter No. 6166
                      My commission expires 10-31-25
18
19  Time used by each party:
    Mr. Kerry V. O'Brien – 2:32
20  Ms. Kristen A. Laster – 0:03
    Mr. Monte K. Hurst – 0:00
21
22
23
24
25
```

Southwest Reporting & Video Services, Inc.   Registration #189
713-650-1800                      swreptproduction@swreporting.com

Adam Dickens

134

1  STATE   OF   TEXAS  )
2  COUNTY OF DALLAS  )
3         I, Kathy E. Weldon, Certified Shorthand
4  Reporter, in and for the State of Texas, certify that
5  the foregoing deposition of ADAM DICKENS was reported
6  stenographically by me at the time and place
7  indicated, said witness having been placed under oath
8  by me, and that the deposition is a true record of the
9  testimony given by the witness.
10        I further certify that I am neither counsel
11 for nor related to any party in this cause and am not
12 financially interested in its outcome.
13        Given under my hand on this the ____ day of
14 _____, 2023.
15
16                    _____
                     Kathy E. Weldon
17                   Shorthand Reporter No. 6166
                     My commission expires 10-31-25
18
19 Time used by each party:
   Mr. Kerry V. O'Brien – 2:32
20 Ms. Kristen A. Laster – 0:03
   Mr. Monte K. Hurst – 0:00
21
22
23
24
25