# O'BRIEN LAW FIRM

1011 WESTLAKE DRIVE  
AUSTIN, TEXAS 78746  
PHONE: 512.410.1960  
FAX: 512.410.6171

KERRY V. O'BRIEN  
TEXAS BAR NO. 24038469  
KO@OBRIENLAWPC.COM  
TEXASEMPLOYEES.COM

| | |
|---|---|
| **BASIL LEO RILEY, III'S 2ND AMENDED RESPONSE TO CRU USA'S 1st INTERROGATORIES** ||
| Case Style | Civil Action No. 4:22-CV-1073-SDJ; *C. M. Collins, N. J. Lundy, and R. C. L. Mays, individually and on behalf of all others similarly situated v. Catastrophe Response Unit, Inc. and Catastrophe Response Unit USA, Inc.*, In the United States District Court for the Eastern District of Texas, Sherman Division |
| Date | Nov 26 2023 |
| From | Basil Leo Riley, III<br>℅ O'Brien Law Firm, 1011 Westlake Drive, Austin, Texas 78746 |
| To | Defendant – Catastrophe Response Unit USA, Inc.<br>c/o HALLET & PERRIN, P.C., 1445 Ross Avenue, Ste, 2400, Dallas, Texas 75202 |
| Total pages | 9 pages + audit trail |
| Certificate of Service | By my signature below, I hereby certify that these 2nd Amended Responses to CRU USA, Inc.'s Interrogatories were served on the following via email transmission on the date above:<br><br>Monte K. Hurst<br>State Bar No. 00796802<br>monte.hurst@hallettperrin.com<br><br>Kristen A. Laster<br>State Bar No. 24076499<br>kbrumbalow@hallettperrin.com<br><br>HALLETT & PERRIN, P.C.<br>1445 Ross Avenue, Suite 2400<br>Dallas, Texas 75202<br>214.953.0053<br>(f) 214.922.4142<br><br>COUNSEL FOR DEFENDANTS |

Respectfully submitted,

*Kerry O'Brien*

Kerry V. O'Brien  
COUNSEL FOR PLAINTIFFS

# RILEY'S 2nd AMENDED RESPONSES TO
# CRU USA INC.'S FIRST INTERROGATORIES

Notes: For any current or former CRU adjusters who appear in these responses to CRU USA's interrogatories, that individual's last-known address and phone number, if not otherwise stated in Plaintiffs' FRCP 26 disclosures, should be considered the last-known address and phone number as shown in the business records of Defendants. Legal objections and legal responses by Plaintiff's counsel are in italics and do not constitute responses to which Plaintiff's verification applies. All references to minimum wage violations are disregarded, as Plaintiff is not claiming minimum wage violations in this suit. Riley's responses below are in addition to any responsive information elicited through his testimony from his deposition on October 18, 2023.

**INTERROGATORY NO. 1**: Please provide the following for each person or company for which you have, within the last 10 years, been employed or otherwise provided services in exchange for renumeration (including, but not limited to, independent contractor services):

  a. Dates of employment/work as an independent contractor;
  b. Name of person/company;
  c. Position(s) held;
  d. Brief description of the job duties of each position held;
  e. Whether you were an employee or independent contractor;
  f. Location(s) where you performed services;
  g. Name of supervisor(s);
  h. Rate(s) of pay; and
  i. Reason(s) why you are no longer working or providing services for this person/company.

**RESPONSE**: *Objection. Given the request for 10 years of job history, this request is overly broad and bears no reasonable relation to the issues in dispute in this case. Furthermore, Plaintiff's pay rate, supervisor, and reason for separation bear no relation to the information necessary for Defendants in this unpaid overtime case, regardless of the time period during which such work occurred. Plaintiff will provide responsive information otherwise requested by this Interrogatory, for the period of January 1, 2020 (the earliest year in which the FLSA may apply in this case) to the present:*

From January 1, 2020 to the present:

Just before CRU, Riley was working as a desk adjuster for client State Farm through vendor CNC (Catastrophe & National Claims) and was paid on a W-2 basis by CNC. He was initially working from an office in Winter Haven, Florida, but was sent home at the beginning of the pandemic and has been working from home since.

From around July 2021 through around September 2021, Riley was working for Progressive. He quit Progressive when instructed by Randy Bray of CRU that he and the other desk adjusters

were not allowed to have second jobs while working for CRU, and that they would be released if CRU found out that they had a second job.

After CRU, Riley has worked as a desk adjuster for Griston Claims, for insurer client HCPCI (Homeowners' Choice Property & Casualty Insurance). Riley ended with CRU on or about September 17, 2022 and started with Griston Claims on or about October 3, 2022. Griston pays him on a W-2 hourly basis.

In the initial weeks of working for CRU, Riley recalls that he was still working for Progressive as well. Riley was working in the CRU automobile claims department at first. In the September/October 2021 period of time, Riley recalls that Randy Bray of CRU told him and other desk adjusters in a meeting on a Saturday that if they were working a second job, CRU required them to quit it. Bray told the group that if they were caught working a second job, they would be released by CRU. Upon that instruction, Riley quit his position with Progressive. Due to that instruction, Riley never again worked a second job while working for CRU. Riley recalls Bray referring to that instruction a number of times following, even saying something to the effect of "Hey, I'm telling you guys right now, if I haven't found out about you working a second job, you're lucky."

**INTERROGATORY NO. 2**: Please identify (a) each day you performed work for either one of the Defendants, (b) the number of hours you performed work that day, (c) the specific hours you performed work that day, (d) the name of the Defendant for which you performed work, and (e) each document or source of information that shows the days/hours you performed work.

**RESPONSE**: *While Plaintiff has the general burden of proof on demonstrating his compensable hours, Plaintiff objects to the extent that this Interrogatory is intending to put the burden on Plaintiff to have tracked the start and stop time of his work periods on a daily basis when such responsibility belongs to the employer pursuant to federal law. Therefore, the interrogatory is misleading and harassing. Furthermore, because Plaintiff did not track the start and stop time of the daily work shifts with specificity, Plaintiff will respond with his good faith estimate to assist in demonstrating his compensable hours as a matter of just and reasonable inference. With the above considered, Plaintiff responds as follows:*

At a basic level, Riley always worked at least 10 hours a day, 6 days a week, throughout his employment with CRU, unless they were off work due to a holiday (although he would still work over 40 hours in such weeks). However, he would commonly work anywhere from 2-4 additional hours the majority of days to keep up with the workload, especially during his first month with CRU and especially when he was working in the BAU department when he would for 2-4 additional hours *every* day. His required shift started at 8am Eastern.

He recalls that he started at a day rate of $450 CAD per day and ended at $550 CAD, but does not recall exactly when he received pay increases to his day rate during his employment with CRU.

He was required to check in through the Microsoft Teams chat to essentially clock-in at the beginning of his work shift and clock-out at the end of his work shift. He would have logged in and out of a program called Guidewire. There was a task tracker that he had to fill in throughout

the day, and his emails, and his phone calls, and any other system log in/log out records, all of which would assist in verifying his estimate of his work time or that may provide even more precise day on the beginning time and ending time of his daily work period.

For his work relevant to this suit, Riley was employed by Catastrophe Response Unit USA, Inc., but was also subject to the direction and control of Canada-based CRU management staff who were employed by Catastrophe Response Unit, Inc.

**INTERROGATORY NO. 3**: Please provide a computation of each category of damages claimed by you in this lawsuit, including (a) applicable dates, (b) amounts of claimed unpaid wages, (c) the name of the Defendant responsible, and (d) the method used for computation (including applicable rates and hours).

**RESPONSE**: *Plaintiff objects to the extent that this interrogatory asks him a question of pure law (which is outside of the scope of Federal Rule of Civil Procedure 33), to the extent that it asks him to identify the Defendant legally responsible for his damages pursuant to the Fair Labor Standards Act. It is Plaintiff's contention, through legal arguments put forth by counsel, that both Catastrophe Response Unit, Inc. and Catastrophe Response Unit USA, Inc. are legally responsible for Plaintiff's damages as "employers" under the Fair Labor Standards Act. With the above considered, Plaintiff responds as follows:*

Both Catastrophe Response Unit, Inc. and Catastrophe Response Unit USA, Inc. are responsible for Riley's unpaid overtime wages. The legal reasons that both companies within the CRU business operation are responsible are legal matters for his attorneys to address and are not within his knowledge as a layperson, but generally, it is likely that the Canadian CRU entity employed individuals who supervised and controlled the work of Riley.

Company information obtained during the appropriate phase of discovery in this case will show his day rate and the date of changes to that day rate during his employment with CRU USA, that he recalls started at $450 CAD per day and ended at $550 CAD per day, that will be used to calculate his unpaid overtime wages with more precision, to supplement his good faith estimate of his work time, and Defendants should refer to those payroll and employment records for such information. However, based on his estimate, he worked a minimum of 60 hours per week in a 6-day workweek, with an addition estimated 8-16 hours per week outside of his required work hours, and more when he would occasionally work on Sundays.

The calculation method used to determine his unpaid overtime wages is anticipated to be:

> (day rate x number of days worked) ÷ (number of hours per week) = regular rate
> (regular rate ÷ 2) x (# of hours over 40) = unpaid overtime wages for the week

That calculation method is based on the Fair Labor Standard Act and is therefore provided through the knowledge and experience of his attorneys, as Riley does not possess the knowledge as a layperson to speak on how overtime is calculated under that law. He is relying on his attorneys to identify and perform those calculations, and he can only speak on his historical knowledge of his work with CRU.

Riley is also asking the court to double the amount of unpaid overtime wages due to him, called "liquidated damages," the basis for which is also something of which he does not have knowledge as a layperson and about which he is relying on his attorneys.

**INTERROGATORY NO. 4**: For each Request for Admission that you denied, please explain the basis for your denial.

**RESPONSE**: *Plaintiff will state that each Request for Admission addressed in response to this interrogatory is a "discrete subpart" for purposes of Federal Rule of Civil Procedure 33. Therefore, Plaintiff's responses to this interrogatory constitute 5 additional interrogatories propounded by CRU USA. With that consideration stated, Plaintiff responds as follows:*

Re: Response to RFA No. 2: To Riley's recollection, $30K authority had to be requested to and approved by management.

Re: Response to RFA No. 4: Riley was expected to be working at least 8am-6pm Eastern, Monday through Saturday, just like any work schedule required of an employee.

Re: Response to RFA No. 5: He was not able to work another job while working for CRU.

Re: Response to RFA No. 6: Riley amended his answer because he was initially working for Progressive in the initial weeks of working for CRU. Riley was working in the CRU automobile claims department at first. In the September/October 2021 period of time, Riley recalls that Randy Bray of CRU told him and other desk adjusters in a meeting on a Saturday that if they were working a second job, CRU required them to quit it. Bray told the group that if they were caught working a second job, they would be released by CRU. Upon that instruction, Riley quit his position with Progressive. Due to that instruction, Riley never again worked a second job while working for CRU. Riley recalls Bray referring to that instruction a number of times following, even saying something to the effect of "Hey, I'm telling you guys right now, if I haven't found out about you working a second job, you're lucky."

Re: Response to RFA No. 7: Denied as CRU treated him like an employee, having to attend the morning meeting, having to work a specific work schedule, being subjected to workload quotas, having to tell supervisors when he would clock and out for lunch, having to get approval in advance to take off work, etc. That led Riley to believe that he was thought of and treated like an employee while working for CRU.

**INTERROGATORY NO. 5 (9th interrogatory)**: Identify how many minutes each day you met with your supervisor, on average, while performing work for either of the Defendants.

**RESPONSE**: *Plaintiff objects to the extent that the verb "met" is ambiguous, in that it could mean (1) in-person meetings, (2) virtual video meetings, (3) audio-only meetings by phone or internet, and/or (4) asynchronous written communications between Plaintiff and a Team Lead or manager throughout the day, including written chat applications and emails. Considering these objections, Plaintiff will respond with the understanding that "met" in the context of this interrogatory means live, verbal conversations between Plaintiff and a Team Lead or manager, regardless of whether it was in a one-on-one or group setting, and with the presumption that these were always remote and not in-person meetings. Plaintiff's response does not include time*

*spent on written chat and email with his Team Leads and managers throughout the work day. With those considerations and objections stated, Plaintiff responds as follows:*

The morning meetings were between 30 minutes and two hours in length. Otherwise, each day, Riley estimates that he might have an average of 30 minutes of time verbally communicating with supervisors.

**INTERROGATORY NO. 6 (10th interrogatory)**: Describe the level of supervision that you received while performing work as a Desk Adjuster for either of the Defendants. Your answer should include, but not be limited to, the following: (1) the identity of each supervisor who supervised you, (2) the level of supervision that he/she/they asserted over you, and (3) examples of how he/she/they supervised your work on a daily or weekly basis.

**RESPONSE**: Micromanaged.

Riley would have to say "Good morning" and "Good night" over chat through Microsoft Teams as a way of clocking in and clocking out for the day.

Riley and his fellow adjusters had to keep track of claims activity and work throughout the day on a "tracker" Excel spreadsheet. Supervisors told him that their quota was at least 10 claims per day, and it had to be certain things done to qualify as actual "work" for their satisfaction. Riley and his fellow adjusters would have to input information into the tracking sheet about their activity as they completed each task throughout the day, and the supervisors would monitor that throughout the day to determine how productive it "appeared" that each adjuster was that day. If they looked at the tracker and didn't see any activity on there yet, or not enough activities in their opinion, they would contact the adjuster to question them and pressure the adjuster work harder (even if he or she was already working as hard as they could). In fact, on Riley's first day in BAU claims, the team lead called him out over email for only showing 6 claims that day – again, on his very first day in that department.

Riley had to clock in and out for lunch.

Riley heard about CRU threatening to dock adjusters' pay if the supervisors didn't feel like an adjuster had a sufficient quantity of activity on their tracker on any given day. He isn't certain, but he believes that Rasheedah Mays had her pay docked on this basis.

There are two trackers – the Excel group tracker, and the adjuster's own personal claims for the day. Sometimes when Riley would setup his claims for the day, supervisors would ask why he set up so many claims for the day, but with the amount of claims assigned to him he felt he had no choice, because the supervisors required that each adjuster touch each and every claim within a 7-day period, when Riley had over a hundred claims assigned to him at any given time.

While Riley never recalls asking for time off for himself, he knew that he had to get advance permission from a supervisor to take time off work.

He recalls supervisors verbally complaining about the work performance of various adjusters, including if he recalls correctly Carla Collins, Rasheedah Mays, and Ashley Ruise.

Riley would have to respond promptly to any inquiries by team leads. If he didn't respond promptly enough for their satisfaction, they would bring it up with him to complain.

During the morning meetings, Riley would often work claims while the morning meeting was going on, perhaps around half the time, just to keep up with the workload. As part of every morning meeting, the supervisors would essentially remind the adjusters that the supervisors were watching over them that day.

Riley was required to send in a minimum number of reconciliations or estimates each day, which was another quota. These requirements above were enforced his supervisors, either directly or through the directives of higher-ups.

During his employment with CRU, Riley recalls that Lajontay Harris, Tamekia Williams, and Richard (last name not recalled) were his team leads. Pardeep Sidhu and Olandria "Faye" Quinnie were the managers.

**INTERROGATORY NO. 7 (11th interrogatory)**: Please identify any child(ren) and/or other dependent(s) who you were responsible for, and/or who lived with you, during the days you claim to have performed work for either of the Defendants, as well as his/her/their year of birth.

**RESPONSE**: Riley has no children and therefore has no information responsive to this request.

**INTERROGATORY NO. 8 (12th interrogatory)**: Please provide the following information for each individual/organization responsible for caring for your child(ren) and/or other dependent(s) (either at your home or another location) during the days you claim to have performed work for either of the Defendants:

a. Name of individual/organization;
b. Date(s) the individual/organization provided care;
c. Hours the individual/organization provided care;
d. Method the individual/organization was paid for providing care; and
e. Identity of each document or source of information that shows the foregoing information about your care.

**RESPONSE**: Riley has no information responsive to this request.

**INTERROGATORY NO. 9 (13th interrogatory)**: Identify all of your sources of income from January 1, 2019 to the present.

**RESPONSE**: *Plaintiff objects to the extent that this interrogatory is overly broad and unnecessarily invasive, if and to the extent that it requests information about what Plaintiff specifically made from non-concurrent employment outside of CRU that would bear no reasonable relation to Plaintiff's claims or CRU's defenses in this case. Plaintiff further contends that it is overly broad in scope of time, and considering that objection, reasonably responds only from January 1, 2020 (the earliest year to which the FLSA may apply in this case) to the present. With the above considered, Plaintiff responds as follows:*

Income since January 1, 2020:

Riley is a disabled veteran with a 10% disability rating, and receives a monthly disability payment as a result. All of his income otherwise has come from his desk adjuster work. Although he has 50% ownership in a construction business, New Millenium Development, Inc., the company has posted losses each year since January 1, 2020.

**INTERROGATORY NO. 10 (14th interrogatory)**: Please describe by category and location all documents, data compilations, and tangible things in your possession, custody, or control that are relevant to disputed facts alleged with particularity in the pleadings.

**RESPONSE**: Refer to any materials produced by Plaintiff as potentially relevant materials.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| C. M. COLLINS, N. J. LUNDY, and R. C. L. MAYS, *individually and on behalf of all others similarly situated*, | § § § § | |
| **Plaintiffs,** | § § | CIVIL ACTION NO. 4:22-cv-01073-SDJ |
| v. | § § | |
| CATASTROPHE RESPONSE UNIT, INC. and CATASTROPHE RESPONSE UNIT USA, INC., | § § § § § | Collective Action under 29 U.S.C. § 216(b) JURY DEMANDED |
| **Defendants.** | § § | |

## INTERROGATORY VERIFICATION

Pursuant to 28 U.S.C. §1746, BASIL LEO RILEY, III declares:

1. "My name is Basil Leo Riley, III and I am competent to make this declaration. These 2nd Amended Responses to CRU USA's First Interrogatories, to which this verification is attached, are true and correct to the best of my knowledge.

2. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This Declaration was executed on ___Nov 26 2023___ in Hillsborough County, State of Florida."

Declarant says nothing further.

*Basil Leo Riley III*
_____
BASIL LEO RILEY, III, Declarant



# Audit Trail

## Document Details

| | |
|---|---|
| **Title** | [rev 11-2023] Riley 2nd Amd CRU Interrogatory Responses.pdf |
| **File Name** | [rev 11-2023] Riley 2nd Amd CRU Interrogatory Responses.pdf |
| **Document ID** | 9c5731affd6f46809db6a55084d90fcf |
| **Fingerprint** | 7b9a2982ba93c810c220ceafa35095c2 |
| **Status** | Completed |

## Document History

| | | |
|---|---|---|
| **Document Created** | Document Created by Kerry O'Brien (ko@obrienlawpc.com)<br>Fingerprint: 2191a8d216a639eef2edb36228582a47 | Nov 26 2023<br>11:10PM UTC |
| **Document Sent** | Document Sent to Basil Riley (basilriley3@yahoo.com) | Nov 26 2023<br>11:10PM UTC |
| **Document Viewed** | Document Viewed by Basil Riley (basilriley3@yahoo.com)<br>IP: 47.197.204.85 | Nov 26 2023<br>11:14PM UTC |
| **Document Signed** | Document Signed by Basil Riley (basilriley3@yahoo.com)<br>IP: 47.197.204.85<br><br>*Basil Leo Riley III* | Nov 26 2023<br>11:16PM UTC |
| **Document Completed** | This document has been completed.<br>Fingerprint: 7b9a2982ba93c810c220ceafa35095c2 | Nov 26 2023<br>11:16PM UTC |

Processed by **xodo sign**