UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| CARLA M. COLLINS, ET AL., | § | |
| *individually and on behalf of all* | § | |
| *others similarly situated* | § | |
| | § | |
| v. | § | CIVIL NO. 4:22-CV-1073-SDJ |
| | § | |
| CATASTROPHE RESPONSE UNIT | § | |
| USA, INC., ET AL. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendants' Emergency Motion to Compel Discovery and to Extend Deadline to File Response in Opposition to Plaintiffs' Motion for Notice, (Dkt. #45), and Defendants' Amended Motion to Compel Discovery, (Dkt. #53). After full consideration, the Court will grant the motions in part and deny them in part.

### I. BACKGROUND

This is a proposed collective action under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. Named Plaintiffs Carla M. Collins, Natine J. Lundy, and Rasheedah C. L. Mays worked for Defendants Catastrophe Response Unit USA, Inc. and Catastrophe Response Unit, Inc. (together, "Catastrophe") as insurance desk adjusters. (Dkt. #1 ¶ 1). Plaintiffs allege that Catastrophe misclassified them and other desk adjusters as independent contractors, instead of non-exempt employees, and failed to pay overtime compensation as required by the FLSA. (Dkt. #1 ¶ 1).

Plaintiffs sued Catastrophe in December 2022. *See* (Dkt. #1). Shortly after Catastrophe filed its answer, the Court entered a preliminary scheduling order authorizing limited discovery related to Plaintiffs' anticipated motion for court-

approved notice under 29 U.S.C. § 216(b). *See* (Dkt. #18, #26, #32). Near the end of the preliminary discovery period, the Court held a telephone conference with the parties "concerning a discovery dispute involving the following issues: (1) information regarding Plaintiffs' other employment/sources of income, (2) information regarding Plaintiffs' social media activity and cellphone activity during hours they claim to have been working, and (3) depositions of new opt-in Plaintiffs." (Dkt. #38). After conferring with the parties, the Court reached the following conclusions:

> First, Plaintiffs should produce W-2 and 1099 forms from 2019 to the present. The Court views production of payroll information as unnecessary at this stage of the case. Second, for the moment the parties have agreed to limit potential discovery on social media activity to Plaintiff Collins. The Court notes that the parties have reached no agreement as to whether the production of any information or materials on Ms. Collins's social media activity is feasible and/or non-objectionable. However, counsel for Plaintiffs and Defendants will further discuss this issue to reach a resolution, failing which they may file appropriate motion(s) with the Court. The Court also noted that the production of phone records goes further than needed at this stage in the case. Third, Plaintiffs have confirmed they will not include declarations or other evidence concerning the newest opt-in Plaintiffs in the briefing contemplated by the Court's Second Amended Preliminary Scheduling Order. With that assurance, Defendants have agreed that these Plaintiffs' depositions need not be taken prior to the completion of such briefing.

(Dkt. #38). The Court concluded by noting that "[t]he parties have met the Court's conference requirement for the discovery disputes discussed during the call and are now free to submit motions on these issues if and as needed." (Dkt. #38).

At the close of the preliminary discovery period, Plaintiffs filed their Section 216(b) motion, seeking court-approved notice of this collective action to "similarly situated" desk adjusters. (Dkt. #40 at 1–2). Before its response deadline, Catastrophe filed an "emergency" motion to compel discovery related to the discovery dispute

addressed at the earlier telephone conference with the Court. (Dkt. #45). According to Catastrophe, Plaintiffs failed to produce various documents relevant to their Section 216(b) motion that they had agreed to produce, without which Catastrophe cannot adequately respond to the motion. (Dkt. #45 at 4). The next day, the Court stayed all remaining deadlines in its preliminary scheduling order pending resolution of the discovery dispute. (Dkt. #46). Catastrophe filed a second, "amended" motion to compel discovery a few months later. (Dkt. #53).

The Court now considers both of Catastrophe's motions to compel discovery.

## II. LEGAL STANDARD

It is well established that "control of discovery is committed to the sound discretion of the trial court." *Williamson v. U.S. Dep't of Agric.*, 815 F.2d 368, 382 (5th Cir. 1987). "Unless otherwise limited by court order," a party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). In assessing proportionality, courts are to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.*

Material within the scope of discovery "need not be admissible in evidence to be discoverable." *Id.* And to be relevant, the material "need not, by itself, prove or disprove a claim or defense or have strong probative force or value." *Samsung Elecs.*

3

*Am., Inc. v. Yang Kun Chung*, 321 F.R.D. 250, 280 (N.D. Tex. 2017). If a party fails to produce discoverable material, the party seeking discovery may move for an order compelling production of that material. FED. R. CIV. P. 37(a)(1), (a)(3)(B).

Here, at this stage of the case, the Court has limited discovery to "issues directly relevant to [Plaintiffs' anticipated motion under 29 U.S.C. § 216(b)], such as the number of proposed collective group members, their job descriptions and procedures, and wage and hour policies and training provided." (Dkt. #32 at 2). Put differently, discovery at this stage must be relevant to answering "whether putative plaintiffs are similarly situated"—that is to say, "whether merits questions can be answered collectively." *Cervenka v. Jumpp Logistics, LLC*, No. 4:21-CV-813-SDJ, 2026 WL 373080, at *2 (E.D. Tex. Feb. 10, 2026) (cleaned up). "Broad discovery into the merits of the claims at issue, rather than focused exclusively on issues related to the Court's resolution of Plaintiffs' anticipated Section 216(b) motion, is premature and improper at this time." (Dkt. #32 at 2).

### III. DISCUSSION

Catastrophe seeks several categories of material from various plaintiffs in its motions to compel discovery. One of those plaintiffs—Rasheedah C. L. Mays—has apparently stopped communicating with her counsel entirely. *See* (Dkt. #59 at 3 n.3). The Court will discuss each category of requested discovery and conclude by addressing the unresponsive Plaintiff Mays.

## A. Résumés

In its amended motion to compel, Catastrophe seeks "all Plaintiffs' résumés," which Plaintiffs previously committed to produce. (Dkt. #53 at 2–3). In their response, Plaintiffs advise that each of them, except Mays, has now produced their résumé. (Dkt. #59 at 3). Thus, say Plaintiffs, Catastrophe's request for résumés is moot for all individuals other than Mays. (Dkt. #59 at 3). Catastrophe does not press the issue in its reply brief. *See* (Dkt. #61). As to Mays, Plaintiffs "express[] no opposition to an Order compelling Mays to make production of the responsive résumés." (Dkt. #59 at 3).

The Court agrees that Catastrophe's request is moot for all plaintiffs except Mays. The Court further agrees that Mays should produce her résumé, consistent with her commitment to do so.

Catastrophe's request for Plaintiffs' résumés is therefore **DENIED as moot** for all plaintiffs except Mays. Plaintiff Mays is **ORDERED** to produce her résumé no later than **August 14, 2026**.

## B. Paystubs

Catastrophe next requests that Plaintiff Riley be ordered to produce "paystubs for payments he received from July 1, 2021[,] through September 30, 2022." (Dkt. #53 at 2). In their response, Plaintiffs advise that Riley does not have any paystubs for that timeframe but has produced all other relevant materials concerning his employment during that period. (Dkt. #59 at 4). Plaintiffs thus believe that this issue

is moot. (Dkt. #59 at 4). Catastrophe does not press the issue in its reply brief. *See* (Dkt. #61).

The Court agrees that this issue is moot. Catastrophe's request for Plaintiff Riley's paystubs is therefore **DENIED as moot**.

## C. Tax Documents

### i. W-2 and 1099 Forms

Catastrophe seeks W-2 and 1099 forms from Plaintiffs Mays, Russell-Brown, Nickelberry, and Mansfield. (Dkt. #53 at 2). In support of its request, Catastrophe notes that the Court previously ordered Plaintiffs to produce these documents, and Plaintiffs committed to doing so in accordance with that order. *See* (Dkt. #38) ("Plaintiffs should produce W-2 and 1099 forms from 2019 to the present.").

Plaintiffs don't dispute that they committed to producing their W-2 and 1099 forms. Nor do they dispute that Catastrophe is entitled to the information found on those forms. But they explain that "a number of [plaintiffs] could not locate responsive W-2 and/or 1099 forms in their possessions." (Dkt. #59 at 5). So in lieu of W-2s and 1099s, "each of those individuals obtained their Wage & Income Transcripts directly from the IRS for each of the years 2019–2022." (Dkt. #59 at 5). Those transcripts, Plaintiffs say, "provide[] *exactly* the earnings information that Defendants were requesting through the forms themselves." (Dkt. #59 at 5). In its reply brief, Catastrophe does not dispute that Plaintiffs' Wage and Income

Transcripts include the same relevant information as their W-2s and 1099s.[1] Still, Catastrophe "again respectfully urge[s] the Court to order" Mansfield, Mays, Nickelberry, and Russell-Brown to produce "all Forms W-2 and 1099 from 2019 to the present." (Dkt. #61 at 2).

Notwithstanding its prior directive that Plaintiffs produce their W-2 and 1099 forms, the Court sees no reason to require those forms specifically when other documents include the same information. Catastrophe's request for Mays, Russell-Brown, Nickelberry, and Mansfield's W-2 and 1099 forms is therefore **DENIED in part**. To the extent Mays, Russell-Brown, Nickelberry, and Mansfield are reasonably able to locate or obtain their W-2 and 1099 forms for the years 2019–2022, they are **ORDERED** to produce those forms by **August 14, 2026**. Otherwise, and to the extent they have not already done so, Mays, Russell-Brown, Nickelberry, and Mansfield are **ORDERED** to produce their Wage and Income Transcripts for the years 2019–2022 by **August 14, 2026**.

### ii. Tax Returns

In addition to their W-2 and 1099 forms, Catastrophe seeks Plaintiffs' tax returns or tax return transcripts. According to Catastrophe, Plaintiffs' tax returns (or transcripts) include the following relevant information that their W-2 and 1099 forms do not: "(i) the business deductions credits made by the Plaintiffs related to their adjusting work, and (ii) any Schedule C data, which reports profits or losses from a

---

[1] In fact, in its motion, Catastrophe includes a chart reflecting that an individual's Wage and Income Transcript includes the same relevant information as that individual's W-2 or 1099 form. *See* (Dkt. #53 at 5).

business operated by the filer[.]" (Dkt. #53 at 5). This information, Catastrophe says, is relevant to determining whether putative plaintiffs are similarly situated for purposes of answering merits questions, and thus, under *Swales*, the time for disclosing that information is now. *See Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 441–43 (5th Cir. 2021).

In response, Plaintiffs argue that Catastrophe waived any entitlement to Plaintiffs' tax returns by "(1) previously agreeing to accept production of only 1099 and W-2 tax documents, and (2) exhibiting substantial delay before raising the tax return issue." (Dkt. #59 at 9). Catastrophe "never raised an issue concerning tax returns" in its original motion to compel or at the telephone conference with the Court, (Dkt. #59 at 6), and the Court then stayed this case pending resolution of the discovery dispute presented in Catastrophe's *original* motion, *see* (Dkt. #46). Plaintiffs argue that by the time Catastrophe raised the issue in its amended motion to compel—filed nearly two months later—it was too late.

In its reply, Catastrophe offers little explanation for why it did not raise the issue of tax returns earlier. But it insists that it "is not seeking to delay this proceeding" and "merely seeks to discover the important records . . . that are directly relevant to its forthcoming response in opposition to Plaintiffs' Motion for Notice." (Dkt. #61 at 8).

The Court recognizes that Catastrophe may have been dilatory in raising the issue of Plaintiffs' tax returns. Still, the Court cannot ignore that Plaintiffs' tax returns are directly relevant to their Section 216(b) motion and are thus generally

8

discoverable. In misclassification cases like this one, "the Fifth Circuit has looked to the income and deductions in a plaintiff's tax returns in examining whether a plaintiff was an employee or independent contractor under the FLSA." *Rafeedie v. L.L.C., Inc.*, No. A-10-CA-743 LY, 2011 WL 5352826, at \*2 (W.D. Tex. Nov. 7, 2011) (citing *Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 333 (5th Cir. 1993)). Whether some or all plaintiffs claimed deductions on their tax returns is thus relevant in determining whether they are similarly situated for purposes of answering merits questions.

It also appears to the Court that the burden of obtaining one's tax return transcript is relatively minimal—at least for the year 2022. An individual's tax return transcripts for the current and three prior tax years are available for no charge on the IRS's website. *Transcript types for individuals and ways to order them*, IRS (Mar. 10, 2026), https://www.irs.gov/individuals/transcript-types-for-individuals-and-ways-to-order-them. As of today, then, an individual can download their 2022 tax return transcript merely by creating an online account with the IRS.

In sum, considering the relevance of Plaintiffs' tax returns, and the apparent ease with which one can download his or her tax return transcript for the year 2022, Catastrophe's request is **GRANTED in part**. Plaintiffs are **ORDERED** to produce either their tax return or tax return transcript for the year 2022 by **August 14, 2026**. To the extent Plaintiffs are reasonably able to locate or obtain their 2019–2021 tax returns or tax return transcripts, Plaintiffs are further **ORDERED** to produce those documents by **August 14, 2026**.

## D. Facebook Data

Catastrophe seeks the following categories of data "for each Facebook account Carla Collins manages . . . for days when she claimed to have been working for [Catastrophe]:" posts, messages, comments and reactions, stories, groups, pages, events, and other activity. (Dkt. #45 at 2–3). According to Catastrophe, Collins previously agreed to produce all of this data but to date has produced only bits and pieces. Catastrophe argues that Collins's extensive Facebook activity during the workday undercuts "her claim that [Catastrophe] exercised considerable control over her." (Dkt. #53 at 10).

Collins does not seriously dispute the relevance of her Facebook data but objects to the scope and proportionality of the requested data. Per Collins, "downloading this data as a Facebook user is not [as] easy as [Catastrophe's] counsel apparently believes it to be," and "there is no Facebook support available to contact for assistance." (Dkt. #47 at 4–5). Rather than trying to obtain the Facebook data from Collins herself, Collins suggests that Catastrophe could have simply "issued a subpoena for the data" to Facebook, which is better positioned to compile and provide it in a useful format. (Dkt. #47 at 4). Nevertheless, Collins says she produced a "substantial amount" of the data requested from her primary Facebook profile, amounting to around 3 gigabytes of data. (Dkt. #47 at 4). But she hit roadblocks in attempting to download the rest. As to her other Facebook profiles, Collins says she was "genuinely unable" to get access to those accounts. (Dkt. #47 at 5). And as to her private direct messages, Collins says she has "not had sufficient time to go through

10

those messages to redact . . . highly sensitive and confidential communications and [is] therefore withholding her messages at this time." (Dkt. #47 at 4 n.2). Collins notes that she is "involved in assisting victims of domestic violence, and as a result there are many direct messages in her account that are between Collins and a victim that must remain more confidential than the Court's Protective Order allows." (Dkt. #47 at 4 n.2).

In reply, Catastrophe essentially says that it doesn't believe, or doesn't care, that Collins is unable to download her Facebook data. As to the direct messages, Catastrophe suggests that Collins "either redact names of domestic violence victims, or produce all of these messages unredacted under an 'Attorneys' Eyes Only' ('AEO') designation." (Dkt. #53 at 11). Catastrophe says it has proposed "specific and logical terms for an AEO provision" that would protect Collins's interests, but "Plaintiffs' counsel has refused to agree to such a provision." (Dkt. #53 at 11). As to the data from Collins's secondary Facebook profiles, Catastrophe alleges that Collins has posted from various of those profiles while simultaneously claiming that she cannot access them. *See* (Dkt. #53 at 12). That, Catastrophe says, reeks of "discovery abuse" and is "exactly why an order from the Court is necessary." (Dkt. #53 at 12).

As an initial matter, the Court agrees with Catastrophe that Collins's Facebook activity is relevant to Plaintiffs' Section 216(b) motion. It goes to the first element of the economic-realities test: "the degree of control exercised by the alleged employer." *Cervenka*, 2026 WL 373080, at *3. It also goes to the number of hours she worked—the "central merits question in any FLSA overtime-pay case." *See id.* at *4.

11

Whether Collins spent a considerable amount of time on social media during the hours she claims to have been working is thus relevant in determining whether Plaintiffs are similarly situated for purposes of answering merits questions.

That said, the Court will not order Collins to produce that which she cannot reasonably access and download. Collins is therefore **ORDERED** to produce all requested Facebook data that she is reasonably able to access and download by **August 14, 2026**. To the extent Collins is unable to reasonably access or download any of the requested data, Collins must be prepared to explain, in detail, the steps taken to access or download that data and the reasons why she was reasonably unable to do so. The Court does not consider the volume of requested material, by itself, to be an appropriate excuse. As to Collins's potentially confidential or sensitive direct messages, Collins can either redact the confidential information or work with Catastrophe on an "Attorneys' Eyes Only" designation, as Catastrophe suggests. Finally, to the extent Collins is unable, after reasonable efforts, to produce any of the requested data, Catastrophe may seek to obtain such data by third-party subpoena under Federal Rule of Civil Procedure 45.

**E. Plaintiff Mays**

Plaintiffs' counsel advise that Plaintiff Rasheedah C. L. Mays ceased communicating with counsel in mid-November 2023. (Dkt. #59 at 3 n.3). Counsel further advise that they have made "significant efforts" to contact Mays and obtain her compliance with the discovery obligations at issue in Catastrophe's motions to compel, to no avail. (Dkt. #47 at 3). For those reasons, counsel have filed a motion to

withdraw from their representation of Mays, (Dkt. #62), and do not oppose the Court ordering Mays to produce at least some of the materials requested in Catastrophe's motions to compel, *see* (Dkt. #59 at 3).

Catastrophe asks that, in addition to ordering Mays to produce the documents identified above, the Court order Mays to withdraw at least one of her discovery responses. According to Catastrophe, Mays, through counsel, denied one of its requests for admission *after* Plaintiffs' counsel say she stopped communicating with them. (Dkt. #53 at 13). Catastrophe thus suspects that Plaintiffs' counsel improperly submitted the response on Mays's behalf without her input. *See* (Dkt. #61 at 10). In response, Plaintiffs' counsel say they can't disclose "how that response was formed, due to both the attorney–client confidentiality privilege as well as the attorney work product privilege." (Dkt. #59 at 9). In any event, Plaintiffs' counsel say, "[t]he Court has no authority to set aside" Mays's discovery response. (Dkt. #59 at 9).

The Court disagrees that it has "no authority" to set aside a potentially improper discovery response. *See Equal Emp. Opportunity Comm'n v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017) (explaining that district courts have "broad" and "considerable discretion" in discovery matters (cleaned up)). Still, the Court sees no reason to intervene at this stage. Should Catastrophe want more information on Mays's discovery responses, it should serve an interrogatory for that information.

As to the document requests, the Court has ordered Mays to produce certain documents by August 14, 2026. Should Mays fail to comply with this order, the Court

13

may dismiss her claims under Federal Rule of Civil Procedure 41(b) and grant counsel's motion to withdraw.

## IV. CONCLUSION

It is therefore **ORDERED** that Defendants' motions to compel, (Dkt. #45, #53), are **GRANTED in part** and **DENIED in part**.

It is further **ORDERED** that a status conference is set for **August 21, 2026**, at **10:00 a.m.** at the United States Courthouse, 7940 Preston Road, Courtroom 105, Plano, Texas 75024.

It is further **ORDERED** that, within fourteen days of this Order, Catastrophe may file an application for an award of its reasonable expenses and attorney's fees incurred in making its motions to compel, as required by Federal Rule of Civil Procedure 37(a)(5)(A). Plaintiffs' response shall be due fourteen days from the date on which the application is filed. Catastrophe's reply, if any, shall be due seven days from the date on which Plaintiffs' response is filed.

**So ORDERED and SIGNED this 14th day of July, 2026.**

SEAN D. JORDAN
UNITED STATES DISTRICT JUDGE

14